STATE OF CONNECTICUT *v.* RYAN THOMPSON
(SC 16784)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued May 23—officially released October 28, 2003

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Vincent J. Dooley*, senior assistant state's attorney, and, on the brief, *Patricia M. Froehlich*, state's attorney, and *Roger Caridad*, assistant state's attorney, for the appellant (state).

*Moira L. Buckley*, deputy assistant public defender, for the appellee (defendant).

*Opinion*

BORDEN, J. The issues in this certified appeal[1] are: (1) whether the Appellate Court properly concluded that the trial court improperly permitted a witness to

---

[1] We granted the state's petition for certification to appeal limited to the following two issues: "(1) Did the Appellate Court properly conclude that the prosecutor's three improper remarks in rebuttal argument required reversal of the judgment of conviction?" and "(2) Did the Appellate Court properly conclude that: (a) the trial court improperly permitted one witness to testify as to the credibility of another; and (b) that ruling constituted harmful error?" *State* v. *Thompson*, 260 Conn. 936, 802 A.2d 90 (2002).

comment on the credibility of another witness, and that this evidentiary ruling constituted harmful error; (2) whether the Appellate Court properly concluded that certain improper remarks of the assistant state's attorney in rebuttal argument deprived the defendant of a fair trial; and (3) whether the Appellate Court's judgment should nevertheless be affirmed, in accordance with our inherent supervisory authority over the administration of justice, on the ground that the prosecutor's misconduct in the present case was flagrant and deliberate.[2] We conclude that: (1) although the trial court's evidentiary ruling was improper, it constituted harmless error; (2) the remarks of the assistant state's attorney did not deprive the defendant of a fair trial; and (3) the prosecutor's misconduct in the present case was not so offensive to the sound administration of justice that we should invoke our supervisory authority to affirm the judgment of the Appellate Court. Accordingly, we reverse the judgment of the Appellate Court to the contrary.

The state charged the defendant, Ryan Thompson, with murder with the use of a firearm in violation of General Statutes § 53a-54a.[3] After a jury trial, the jury found the defendant guilty of the lesser included offense of reckless manslaughter in the first degree with a fire-

---

[2] During the pendency of this appeal, we granted the defendant's motion for permission to raise this claim as an alternate ground for affirmance.

[3] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

arm in violation of General Statutes §§ 53a-55 (a) (3) and 53a-55a.[4] The trial court rendered judgment of conviction in accordance with the verdict. The defendant appealed from the judgment of conviction to the Appellate Court. That court concluded that: (1) certain remarks of the assistant state's attorney in final argument deprived the defendant of a fair trial and, therefore, required reversal of the judgment; and (2) the trial court improperly permitted a witness to testify as to the credibility of another witness and that this constituted harmful error. *State* v. *Thompson*, 69 Conn. App. 299, 302, 797 A.2d 539 (2002).[5] Accordingly, the Appellate Court reversed the conviction and ordered a new trial. Id., 328. This certified appeal followed.

The jury reasonably could have found the following facts. On April 18, 1998, the victim, Robert McCaffery, and his best friend, John Jones, attended a party at the apartment of Ron Harding in the Moosup section of Plainfield. The defendant and four of his friends, Robert

[4] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

General Statutes § 53a-55a provides: "(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

"(b) Manslaughter in the first degree with a firearm is a class B felony and any person found guilty under this section shall be sentenced to a term of imprisonment in accordance with subdivision (4) of section 53a-35a of which five years of the sentence imposed may not be suspended or reduced by the court."

[5] The Appellate Court also considered and rejected four additional evidentiary claims of the defendant; see *State* v. *Thompson*, supra, 69 Conn. App. 318–28; and they are not before us in this appeal.

Comeau, Jared Gilkenson, Brandy Stebbins and David Stebbins, also attended, although Harding had not invited them. The defendant and his friends arrived in Brandy Stebbins' car, a purple Chevy Cavalier. The defendant was wearing a white Nike pullover jacket and a baseball cap. Gilkenson had brought the defendant's nunchakus[6] to the party, which he at first wore in the front of his pants. Later, he showed the nunchakus to people at the party. During the party, an argument started among David Stebbins, the defendant and two brothers, Matt Benoit and Chris Benoit, which continued outside Harding's apartment. Sometime during the course of the argument, while they were still inside, Chris Benoit pushed David Stebbins, who then grabbed the nunchakus from Gilkenson, spun them around, and broke them on the stair railing. Harding, who had come outside because he had heard about the fight, broke it up and told the defendant and David Stebbins to leave. At the same time, and because of the fight, Mandie Green, one of Harding's roommates, told everyone that the party was over.

In the meantime, before the party had ended, Jones and the victim had decided to leave, but they heard the altercation out front, so they took an alternate route to their car, climbing down the fire escape and cutting through a neighboring yard. While they were walking, Jones suggested that they climb onto the roof of a nearby garage to smoke a cigarette and watch the argument. They climbed on the roof, but by then the argument appeared to have ended. Jones was kneeling in front, watching Harding's apartment, and the victim was either kneeling or standing behind and to the right of Jones, out of his field of view. Jones could see persons walking back inside Harding's apartment. He heard

---

[6] A set of nunchakus is a weapon that consists of two hardwood sticks joined at their ends by a short length of rawhide, cord, or chain. Oxford English Dictionary (2d Ed. 1989).

a "pop" coming from his left, but did not think it was significant. When Jones had almost finished his cigarette, he asked the victim if he was ready to leave, but received no response. He turned around to look at the victim and saw that he was lying on his back. He leaned over the victim and saw blood coming from the side of his head. When he tried to give the victim mouth-to-mouth resuscitation, the victim coughed up blood, and Jones began to yell for help.[7]

At roughly the same time that Jones and the victim were climbing onto the roof, Harding, who was standing at the end of the driveway with his friend Robert Latour, saw the defendant, David Stebbins and Gilkenson enter Brandy Stebbins' car. Harding then began walking back up the stairs to his apartment. Latour, who remained outside, saw the defendant and Gilkenson get into Brandy Stebbins' car. David Stebbins then walked over to the car, reached into it, walked over to Latour with a rifle, aimed the rifle directly at Latour's face, and told Latour that he would shoot him. Latour responded, " 'Whatever.' " David Stebbins then returned to the car, handed the rifle inside the car, and entered the car. Latour then saw the car drive for a short distance and then stop. Latour next saw the defendant, wearing a white Nike jacket, exit the car carrying something that looked like a rifle,[8] and run between two houses. Latour then heard a "pop," and heard Jones screaming from the nearby garage rooftop. In order to ascertain what had happened, Latour walked on the grass toward the garage roof where Jones and the victim were located. Jones was yelling that the victim had been shot and that someone should call 911. Latour went back into

---

[7] An autopsy conducted the next day, April 20, 1998, determined that the victim had been killed by a bullet to his head. The bullet was examined on May 11, 1998, by a firearms examiner and was identified as a .22 caliber long rifle variety.

[8] On cross-examination, Latour admitted that he could not say for sure whether the object that the defendant was carrying was a rifle.

Harding's apartment and told the people inside to call 911.

Meanwhile, Harding also had heard the popping sound and came back down the stairs and outside.[9] He saw a person, whom he could not positively identify, but who was wearing a white pullover jacket, running with his hands in front of him. That person ran to Brandy Stebbins' car and entered it, and the car drove off. Harding then saw Jones on a roof, waving his arms and yelling for someone to call 911. Harding climbed up to the roof, where he found Jones kneeling over the victim and screaming " 'help me.' "

Officer Brandon Tyrrell of the Plainfield police department arrived at the scene, where Harding told him that the defendant, who had returned to the scene and was walking nearby, still wearing a white jacket, might have some information. Tyrrell drove over to the defendant and asked him about the party, and the defendant responded that he knew only what others had told him. When Tyrrell continued to question the defendant, the defendant repeatedly stated: " 'Just arrest me. I didn't shoot anybody. Just arrest me.' " Tyrrell told the defendant that he was not under arrest, and that Tyrrell just wanted to question him. Tyrrell then left the defendant with another officer and returned to the crime scene. The defendant then reappeared at the scene and began to yell that he had not shot anyone and questioned why anyone would believe that he had done so. Tyrrell and the other investigating officers asked the defendant to leave. When the defendant continued to cause a disturbance, Tyrrell arrested

---

[9] Harding testified that when he came back outside, Latour was still standing at the end of the driveway. This was inconsistent with Latour's testimony that after the popping sound, Latour had walked across the grass toward the garage roof where Jones and the victim were. In addition, Latour testified that he did not recall, after hearing the popping noise, seeing Harding come out of the house.

him for breach of the peace, brought him to the police station, and told him that he was under arrest for causing a disturbance, not for shooting anyone. The defendant, who appeared to be intoxicated, continued to insist that he did not shoot anyone and also asked Tyrrell if the "guy" was all right.

Meanwhile, detectives were sent to locate and interview the other occupants of Brandy Stebbins' car. At approximately 1:50 a.m. on April 19, Detective Martin Graham and Lieutenant William Holmes located David Stebbins at his home, along with Brandy Stebbins, Gilkenson and Stebbins' mother. David Stebbins accompanied Graham and Holmes to their cruiser, where he provided a written statement that he, Brandy Stebbins, Gilkenson and the defendant had left the party without incident. David Stebbins and Gilkenson also agreed to go the police station for administration of a gunshot residue test. When they entered the station, Graham heard the defendant, in an adjoining room, screaming, yelling and swearing. After administration of the test, the police drove David Stebbins home.

While Graham and Holmes were taking David Stebbins' statement, Detectives Richard Bedard and David LeBlanc interviewed the defendant at the police station. Immediately after the defendant had waived his *Miranda* rights,[10] LeBlanc noticed a bite wound on the defendant's forearm, which the defendant told him he had inflicted on himself while he was in his cell. The defendant was agitated, and expressed concern that he had been arrested for shooting someone. After Bedard and LeBlanc assured him that he was under arrest for breach of the peace, not for shooting someone, the defendant agreed to speak to them. During the interview, the defendant asked them who had been hurt and

---

[10] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

how. When Bedard said that someone at the party had been shot, the defendant immediately jumped up and started to scream and swear at the detectives. After they had succeeded in calming the defendant, he asked: " 'What did he get shot with a .22?' " The detectives were surprised at this question because at that point no one involved in the investigation knew the caliber of the weapon used, and they glanced at each other. The defendant then stated: " 'Or a shotgun.' " When Bedard responded that the weapon used was not a shotgun, the defendant again began screaming and swearing at the detectives. When the detectives had once again calmed the defendant, Bedard asked him who at the party had a gun. The defendant again became belligerent, swearing and insisting that there was no gun at the party. When the detectives told the defendant that they would be questioning everyone who was at the party that night, he replied, " 'Well, my boys won't talk to you.' "

During the interview, LeBlanc left the room to answer a page. When he returned, he informed the defendant that he had just been told that the victim was not expected to survive and that the victim's family had decided to donate his organs. At that point, the defendant became enraged, making growling noises, clenching his fists, screaming obscenities and making obscene gestures at LeBlanc. Realizing that they could not control the defendant, the detectives decided to end the interview.

When LeBlanc and Bedard had finished interviewing the defendant, Bedard took a statement from Gilkenson, who was still at the station. In his statement, Gilkenson denied any wrongdoing by himself or any member of his group. The defendant also subsequently gave a written statement, indicating that he went to the party, but that he and his friends left the party at around 11 p.m. without incident.

On April 19, 1998, Joseph Luberto, who knew the defendant from school and had heard about the shooting, called the defendant and asked him whether he had done it. The defendant denied shooting the victim. Furthermore, although Luberto had not mentioned and did not know the caliber of the weapon, the defendant added that he did not know how to load a .22 caliber rifle.[11]

Also on April 19, 1998, based on information they had received in the course of their interview of Latour, the police decided to interview Gilkenson and David Stebbins a second time.[12] Detectives Norman Nault and Steven Rief questioned Gilkenson at his home, in the presence of both of his parents. Initially, Gilkenson repeated his initial assertion that he had no knowledge pertaining to the murder of the victim, but, upon being told that the police had information that someone from Brandy Stebbins' car shot the victim, and upon the urging of his parents, Gilkenson gave the police a second statement, in which he told them that when he, David Stebbins, Brandy Stebbins and the defendant were leaving the party, the defendant, before they left and before he got into the car, came running toward the car with a rifle in his hand. The defendant got into the backseat and leaned the gun against the side window, covering the gun with his arm. The defendant then

[11] Chad Burski, who was the father of Brandy Stebbins' son, testified, however, that he and the defendant had gone shooting together approximately thirty times prior to April, 1998. Although he admitted that the defendant was a bad shot, he stated that he had seen the defendant load a .22 caliber rifle.

[12] Both Gilkenson's and David Stebbins' second statements were admitted at trial for their substance, pursuant to State v. Whelan, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). A statement is admissible for its substance under Whelan if it is: (1) a prior inconsistent statement; (2) signed by the declarant; (3) who has personal knowledge of the facts stated; and (4) the declarant testifies at trial and is subject to cross-examination. Id., 753. The trial court in the present case found that all four elements of Whelan were met for both statements.

said " 'something about he just shot somebody, let's get the hell out of here.' "

Bedard and LeBlanc located David Stebbins at home, and he agreed to accompany them to the police station for questioning. In David Stebbins' second statement, he said that when the defendant had arrived at his house to go to the party, the defendant had stuffed a .22 caliber rifle down his pant leg. The defendant told David Stebbins, Brandy Stebbins and Gilkenson that he was going to sell it to someone in Moosup. Brandy Stebbins then said, " 'I hope that's not loaded,' " to which the defendant replied in the negative.[13] When they arrived at the party, the defendant left the rifle in the backseat of the car. When they left the party, David Stebbins, the defendant, Gilkenson and Brandy Stebbins were in the car. They pulled away, and the defendant told Brandy Stebbins to stop the car and that he would be right back. The defendant then exited the car holding the rifle, and ran in between two buildings that were near Harding's apartment. Within fifteen seconds, they all heard a popping noise. The defendant then came running back to the car, got into the backseat with the rifle in his hand, threw the rifle into the backseat and said, " 'let's get out of here. I think I hit somebody.' " When they arrived at David Stebbins' house, the defendant took the rifle and ran toward his house. David Stebbins stated that he and Gilkenson were " 'real scared' " and hoped that the defendant had not shot anybody.

On April 20, 1998, the police arrested the defendant for the murder of the victim. At the time of the arrest, detectives seized the white jacket that the defendant had been seen wearing on the night of April 18. The gunshot residue test performed on the jacket revealed

---

[13] David Stebbins later recanted this portion of his second statement in a third statement that he gave to Rief and Nault. In his third statement, David Stebbins explained that he had fabricated this exchange between his sister and the defendant in an attempt to protect his sister.

one particle of lead and one particle of antimony, both of which are consistent with gunshot residue. The gunshot residue tests performed on swabs taken from Gilkenson and David Stebbins revealed lead on both of their hands.

At trial, both Gilkenson and David Stebbins testified that the police had coerced them into giving their second statements and that the statements were false. Instead, both testified consistently with their initial statements, denying any involvement by any member of their group, including the defendant, in the murder of the victim. Therefore, because the trial court found all four elements of *Whelan* satisfied for both statements; see footnote 12 of this opinion; the court granted the state's motion to have both statements admitted for their substance pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

I

THE TESTIMONY OF SERGEANT JOHN TURNER

We first address the state's claim that the Appellate Court improperly concluded that the trial court abused its discretion when it allowed one witness to testify as to the credibility of another witness. We agree with the Appellate Court that the trial court's evidentiary ruling constituted an abuse of discretion, but we conclude that it was harmless error.

The defendant's claim arose in the following procedural context. The defendant called Sergeant John Turner of the Connecticut state police, who directed the investigation of the shooting, to testify in the defendant's case. During the direct examination, defense counsel questioned Turner about his investigation of certain inconsistencies between the statement that Latour gave to the police and those of other witnesses.

Specifically, in a statement that Harding gave to the police on April 21, 1998, he claimed that Latour had told him that Latour actually had seen the defendant hold the rifle up and fire it. Nowhere in Latour's statement, however, did Latour claim that he had seen the defendant fire the gun. Additionally, the police had received reports from witnesses who claimed that Latour initially had told them that *David Stebbins* had shot the victim. In response to receiving these conflicting statements, Turner sent detectives to reinterview Latour, but the detectives did not take a second statement from him. On direct examination, when questioned by the defendant as to why he did not direct the detectives to obtain a second statement from Latour, Turner testified that Latour did not change his statement upon being reinterviewed, and further testified that he believed that he had already sufficiently addressed any conflicting information between Latour's statement and those of other witnesses.

During cross-examination of Turner by the state, the following colloquy occurred:

"[State's Attorney]: Sergeant, how would you describe . . . Latour as a witness?

"[Defense Counsel]: Excuse me?

"The Court: Do you have an objection?

"[Defense Counsel]: He didn't see him testify. How can he describe him as a witness?

"[State's Attorney]: I'm talking about the investigation. . . . As far as your investigation of this incident goes, would you—how would you characterize . . . Latour?

"[Turner]: I would characterize him as reliable and consistent.

"[Defense Counsel]: I move to strike that, Your Honor. That—the—that's a conclusory opinion, 'reliable and consistent.' It has nothing to do with his observations of the witness. It's his analysis of what he feels the witness' statements are.

"The Court: Well, it's responsive to the question that was asked. I didn't hear an objection. I was sort of expecting one and I didn't get one, and so I think it's too late at this point. But it was responsive to the way the question was asked to him.

"[Defense Counsel]: I would move to strike it then, Your Honor. As it's not a proper opinion for this witness to give.

"The Court: Well, it's too late."

The Appellate Court concluded that it was an abuse of discretion for the trial court to deny the defendant's motion to strike Turner's testimony that Latour was a "reliable and consistent" witness. *State* v. *Thompson*, supra, 69 Conn. App. 314. In addressing this issue, we first set forth the applicable standard of review. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 354–55, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

"[D]eterminations of credibility are for the jury, and not for witnesses." (Internal quotation marks omitted.)

*State* v. *Singh,* 259 Conn. 693, 707, 793 A.2d 226 (2002). Therefore, "it is improper to ask a witness to comment on another witness' veracity." Id., 706. "[Q]uestions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." (Citations omitted; internal quotation marks omitted.) Id., 707–708.

The challenged testimony in the present case violates the basic rule articulated in *Singh.* That is, in response to the state's attorney's question, "[H]ow would you describe . . . Latour as a witness?" Turner stated that Latour was "reliable and consistent." This testimony invaded the province of the jury by commenting on the veracity of another witness. The testimony, therefore, was inadmissible, and it was an abuse of discretion for the trial court to deny the defendant's motion to strike the answer.

The state contends that because the assistant state's attorney's question attempted to clarify why Turner had not investigated Latour more thoroughly than he had, and because the question was narrowly tailored to allow Turner to testify only as to Latour's character as a witness *during the investigation,* Turner's testimony was not an improper comment on Latour's character for truthfulness, but rather a proper response to the direct examination. We agree, however, with the Appellate Court that "[a]lthough Turner's testimony was not an express statement of Latour's truthfulness as a witness, such testimony had the same substantive import . . . ." *State* v. *Thompson,* supra, 69 Conn. App. 317–18. If we were to allow the state to circumvent the rule barring one witness from testifying as to the veracity of another witness merely by characterizing that com-

ment as one directed at the veracity of the witness during the investigation, we would render the prohibition meaningless. It would simply be too easy for a party who desired to suggest to the jury that a certain witness was reliable, or unreliable, to ask an investigator to testify as to the witness' veracity during the investigation.

Although we conclude that the admission of the testimony was an abuse of discretion, we also conclude that it was harmless error. The improper comment was not repeated during trial, and the state's attorney did not emphasize or rely upon the testimony during closing argument. Moreover, we disagree with the Appellate Court's conclusion that "Latour's credibility and testimony were pivotal to the state's case." Id., 317. Irrespective of Latour's testimony, there was significant other evidence of the defendant's guilt, namely, the results of the gunshot residue test on the white Nike jacket found in the defendant's home, the statements and testimony of numerous witnesses, including Harding, Tyrrell, Gilkenson and David Stebbins, that the defendant was wearing a white Nike jacket on the night in question, the defendant's own testimony that he wore the jacket in question on the night of the shooting, Harding's testimony linking the defendant to the shooting by virtue of the white jacket, the *Whelan* statements of Gilkenson and David Stebbins, which incriminated the defendant as the shooter, the defendant's unusually agitated behavior, both at the scene and during questioning, the fact that the defendant said, while being interrogated, and before anyone involved in the investigation knew the caliber of the weapon, "What did he get shot with a .22?", and his similar statement the next day to Luberto regarding the caliber of the weapon.

## II

## THE STATE'S CLOSING ARGUMENT

The state next claims that the Appellate Court improperly concluded that the remarks of the assistant state's attorney during closing argument so infected the trial with unfairness as to render the resulting conviction a denial of due process and a deprivation of the defendant's right to a fair trial. The defendant failed to preserve his claim at trial and the Appellate Court reviewed the claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40. Although we agree with the Appellate Court that the defendant met the first two prongs of *Golding*, we conclude that, because the prosecutor's improper remarks did not deprive the defendant of a fair trial, the defendant has failed to satisfy the third prong.

"Before addressing the merits of the defendant's claim, we first review the principles that govern our resolution of claims of prosecutorial misconduct. [T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a

denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161–62, 836 A.2d 224 (2003).

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments." Id., 162. In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Citations omitted; internal quotation marks omitted.) Id. This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. "He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influ-

ence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, 96 Conn. 160, 168–69, 113 A. 452 (1921).

In other words, although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. *Viereck* v. *United States*, 318 U.S. 236, 253, 63 S. Ct. 561, 87 L. Ed. 734 (1942) (Black, J., dissenting). In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions; *State* v. *Ferrone*, supra, [96 Conn.] 163; and those which are flagrant and therefore deny the accused a fair trial. *State* v. *Chapman*, 103 Conn. 453, 477, 130 A. 899 (1925)." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538, 529 A.2d 653 (1987). Thus, prosecutorial misconduct occurring in final argument "may be . . . so egregious

that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Internal quotation marks omitted.) Id., 539.

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 164.

Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified "we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial." (Internal quotation marks omitted.) Id., 215 n.183. Thus, the question in the present case is whether "the sum total of [the assistant state's attorney's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process." Id., 214–15. The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. See *State* v. *Singh*, supra, 259 Conn. 725. "Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks." *State* v. *Reynolds*, supra, 264 Conn. 165.

With these principles in mind, we turn to an analysis of the assistant state's attorney's closing argument. The

claimed improprieties fall into the following general categories: (1) expressions of personal opinion regarding the credibility of witnesses; (2) expressions of personal opinion concerning the moral character of defense witnesses and the guilt of the defendant; (3) appeals to the jurors' passions; (4) a suggestion that the jurors' oath required the return of a guilty verdict; and (5) reference to facts not in evidence. Although the Appellate Court focused on three particular remarks in its analysis of the defendant's claims of prosecutorial misconduct, it expressly noted that it limited its inquiry to those three remarks solely because the court concluded that the remarks were so egregious that they alone required reversal. *State* v. *Thompson,* supra, 69 Conn. App. 304. Because we disagree with the Appellate Court's conclusion that those three remarks were sufficient to deprive the defendant of a fair trial, we consider all the instances of misconduct alleged by the defendant. Furthermore, because the defendant contends that it was not any one particular category, but rather the totality of the misconduct, that deprived him of a fair trial, we first address each category to determine whether the particular conduct was in fact improper, then we consider whether the totality of the established improprieties deprived the defendant of a fair trial. See *State* v. *Singh,* supra, 259 Conn. 702.

Preliminarily, we note that the state concedes that some of the remarks of the assistant state's attorney were improper. For instance, the state concedes that it was improper for the assistant state's attorney to express his opinion that the behavior of David Stebbins and Gilkenson was "reprehensible," that they lacked "moral fortitude" and a "conscience," lived in a "twisted world" and were not "stand-up enough guy[s]" and that "[in] their misguided loyalty to their friend, [the defendant], [Gilkenson and David Stebbins had] reserved a place in hell for themselves." The state also concedes

that it was improper for the prosecutor to remark: "[Defense counsel] says nobody else was arrested but [the defendant]. None of these other kids have been arrested. The operative word is 'yet.' David Stebbins . . . Gilkenson and Brandy Stebbins have not yet been arrested." It is not necessary, therefore, for us to determine whether these particular remarks were improper.

A

Expressions of Personal Opinion Regarding the Credibility of Witnesses

We first set forth the principles that are common to all of the alleged improper comments on the credibility of witnesses. "[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 163. Put another way, "the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence." (Internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 305, 755 A.2d 868 (2000). "Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 163. Keeping these principles in mind, we now turn to the defendant's claims.

We also note, because it is potentially relevant to all of the claimed improper comments on credibility, that the prosecutor informed the jury in the beginning of his rebuttal argument: "As the finders of fact it is your

job to determine what the truth is. . . . [I]s what the witnesses [told] you on the stand the truth? Is what the witness said in the statement the truth? Is it a combination of both that is true?" We addressed a similar disclaimer in *Singh,* where we stated that such prefatory remarks "do not transform an otherwise improper form of argument into a proper one. They may, however, have some bearing on our determination as to whether an improper argument was prejudicial." *State* v. *Singh,* supra, 259 Conn. 715.

The defendant claims that the prosecutor repeatedly expressed his opinion regarding the credibility of witnesses. Specifically, the defendant claims that the prosecutor: (1) set forth a general theme characterizing the defense's version of the events on the night of the shooting as fantastical; (2) stated that certain defense witnesses were lying; (3) stated that various state witnesses were telling the truth; and (4) stated that in order for the jury to believe defense witnesses, it would have to believe that state's witnesses were lying. We set forth the relevant facts for each of these claims and discuss them in turn.

1

The Prosecutor's General Theme That the Defendant's Version of the Events Was Fantastical

In his closing argument, the prosecutor characterized the defendant's version of the night's events, along with the testimony of defense witnesses, as a fantasy world akin to that encountered by Alice, both in Wonderland and through the looking glass.[14] For example, the assistant state's attorney argued that, in order to believe the testimony of defense witnesses, the jury would have needed "to step through the looking glass and follow

---

[14] See L. Carroll, Alice's Adventures in Wonderland (Bantam Books 1981 Ed.); L. Carroll, Through the Looking Glass (Bantam Books 1981 Ed.).

the white rabbit down into the rabbit hole. It's only in this fantasy world that truth is stranger than fiction. In this fantasy world . . . Latour must be a liar. In this world beyond the looking glass, the police coerced witnesses at the kitchen table and in the company of their parents. Down in this rabbit hole unusual and bizarre behavior is consistent with innocence not guilt. In this fantasy world the only unbiased witness the defense can concede is . . . Comeau, a friend of the defendant." Later, when referring to the testimony of Paul Benoit, who testified that Latour told him that it was David Stebbins who had shot the victim, the prosecutor remarked on the fact that Paul Benoit had taken eighteen months to come forward with this information: "We now know without any doubt that there are rocks in the rabbit hole. We know there are rocks down there because Paul Benoit must have been hiding under one of them for the past [eighteen] months." Again, in reference to the testimony of Gilkenson and David Stebbins that the police had coerced them into making their *Whelan* statements, the prosecutor stated: "In this fantasy world that they're trying to peddle, the state police can coerce two innocent boys who know nothing of any crime to implicate their best friend, and where in the rabbit hole do these monumental acts of coercion take place? . . . It is only in this fantasy world where the parents, after urging the children to tell the truth, are going to come in and say we were coerced."

The mere fact that the prosecutor employed the rhetorical device of incorporating a literary theme into his closing argument did not render his remarks improper. Accord *State* v. *Cotton*, 77 Conn. App. 749, 774, 825 A.2d 189 (2003) (reference to Lewis Carroll's Through the Looking Glass was not improper). As we stated earlier in this opinion, "[t]he occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn.

162. Through his literary allusions to Lewis Carroll's "topsy-turvy" imaginary worlds, in which the irrational prevailed over the logical, the prosecutor argued in effect that in order for the jury to believe the defense witnesses, it would have to suspend logic and ignore the weight of the evidence. This was mere rhetorical flourish and not improper argument.

2

### The Prosecutor's Assertions That Certain Defense Witnesses Were Lying

In addition to his general theme concerning the defendant's allegedly fanciful version of the events of the night in question, the prosecutor also made more prosaic, repeated and direct assertions that defense witnesses were lying. For example, when discussing the state's theory that either David Stebbins or Gilkenson disposed of the gun, the state's attorney remarked: "Even though [David] Stebbins told the police that [the defendant] left the car and hid the weapon, we can be fairly certain that he lied when he said that." Later, remarking on the initial statement that the defendant gave to the police, the prosecutor said: "We know that [the defendant's] account of what happened at the police station was a lie."

It is not improper for the prosecutor to "comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989). We must give the jury "the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply say-

ing 'I submit to you that this is what the evidence shows,' or the like." *State* v. *Singh,* supra, 259 Conn. 726–27 (*Borden, J.,* concurring and dissenting).

The prosecutor's comment that David Stebbins lied when he testified that the defendant hid the gun occurred in the context of his discussion of the evidence that would support the inference that Stebbins had lied, namely, that Stebbins' gunshot residue test showed the presence of lead on his hands and Stebbins had ample time to hide the weapon.[15] Similarly, the prosecutor's statement that the defendant lied to the police followed a detailed summary of the evidence supporting that inference. Neither statement was improper.

In another portion of his closing argument, the prosecutor discussed the testimony of Jared Gilkenson's mother, Judith Gilkenson, who testified about the pressure that she and her husband placed on Jared Gilkenson when he gave his *Whelan* statement: "While [Judith] Gilkenson got up on the stand and protected her son with the same unthinking veracity as a tiger . . . protecting her cubs, for all [her] machination, she was unable to keep the lies straight." We previously have held that it is not improper for the state to argue that a witness had no apparent motive to lie. *State* v. *Burton,* 258 Conn. 153, 170, 778 A.2d 955 (2001). We see no reason why the converse should not also be true. It is not improper for a prosecutor to remark on the motives that a witness may have to lie. The prosecutor's remark that Judith Gilkenson lied to protect her son falls into this category. In that remark, the prosecutor was calling attention to the motivation that the witness had to lie in order to protect her son. Therefore, the statement was not an improper comment on the credibility of the witness.

---

[15] The prosecutor advanced a theory during closing argument that, after the shooting, either Gilkenson or David Stebbins removed the gun from the car and hid it.

The prosecutor also stated that Gilkenson and David Stebbins were lying when they recanted their *Whelan* statements. After stating that it was "reprehensible" that they had not prevented the defendant from shooting the victim, he said: "The fact that they would come *into court and lie to protect him* is even more reprehensible. If neither one of these kids had the moral fortitude to prevent [the victim's] death, do you honestly believe for one minute that their character would prevent them from coming into court and *lying to protect their friend*?" (Emphasis added.) Although it is not improper to comment on a witness' motive to lie, these particular remarks went beyond such permissible argument because they were inextricably linked to the prosecutor's conceded improper comments on the moral character of Gilkenson and David Stebbins, which we discuss later in this opinion. Therefore, these comments constituted improper comments on the credibility of the defense witnesses.

3

The Prosecutor's Assertions That Certain of the State's Witnesses Were Telling the Truth

The prosecutor also asserted that certain of the state's witnesses were telling the truth. Specifically, in addressing defense counsel's contention during closing argument that the testimony of Latour and Harding was inconsistent and that Latour's testimony was inconsistent with his own prior statements, the prosecutor stated: "[S]ince day one . . . Latour has said, 'David Stebbins pointed the gun at me. [The defendant] got out of the car with the gun.' [Defense counsel] gives you no possible reason why . . . Latour would come in and lie in that particular way. He cannot give you a reason because . . . Latour was telling the truth. He told the truth in April when the police first spoke with him. He told the truth when he testified at the probable

cause hearing, and he told the truth when he testified before you. When he told you it was [the defendant] that got out of the car carrying a rifle, he was telling you the truth. We also know that . . . Harding and . . . Latour were telling the truth because David Stebbins and . . . Gilkenson confirm everything they say." We agree with the state that, in this portion of his argument, the prosecutor was merely submitting a conclusion about truth that was tied to the evidence, namely, that Latour had no reason to lie, that Latour's story remained consistent throughout the investigation and the trial,[16] and that the testimony of Harding and Latour was corroborated by the *Whelan* statements of Gilkenson and David Stebbins. Although it would have been preferable for the assistant state's attorney to have expressed more clearly that he was suggesting that the inference that Latour was telling the truth was tied to the evidence, the comments were not improper.

The prosecutor also stated that, when Gilkenson and David Stebbins gave their *Whelan* statements, they "truthfully told the police who amongst them was responsible." This remark was not tied to any discussion of the evidence; rather it was a voucher for the

---

[16] We note also that the defendant claims that the prosecutor improperly impugned the institutional role of defense counsel and belittled the defense by remarking, in regards to the claimed inconsistencies between the testimony of Latour and Harding at trial and their earlier statements and testimony at the probable cause hearing, that Latour and Harding "told you what they remembered. [Defense counsel] points out all the inconsistencies between the testimony at the probable cause hearing and the trial and the statements. *This type of thing happens all the time.*" (Emphasis added.) This was not an improper remark belittling the defendant's theory of the case or impugning the institutional role of defense counsel. Rather, it was merely an attempt by the assistant state's attorney to provide an explanation for the inconsistencies, namely, that witnesses cannot be expected to have precisely the same recollection of every detail of an event that happened quite some time ago. In fact, immediately after the challenged comments, the prosecutor explained: "It has been almost two years since [the victim] was murdered. . . . Most people have trouble remembering what they had for dinner a week ago."

credibility of the *Whelan* statements of Gilkenson and David Stebbins, connected only to the prosecutor's improper comments on the moral character of those two witnesses. Therefore, this remark was improper.

The defendant also claims that the prosecutor improperly vouched for the credibility of the police in making the following remarks in his initial closing argument: "The detectives of the major crime squad, just like the people of the state of Connecticut, the same people that pay their salaries, want to see that justice is served. They want to see that the person that killed [the victim] is brought to justice." It is improper to suggest that the jury should accord greater weight to the testimony of police officers on account of their occupational status. Indeed, Connecticut courts routinely instruct juries that they should evaluate the credibility of a police officer in the same way that they evaluate the testimony of any other witness, and that the jury should "neither believe nor disbelieve the testimony of a police official just because he is a police official." J. Pellegrino, Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001) § 2.29, p. 74. The prosecutor's remark, however, was a reasonable response to one of the primary theories advanced by the defense in the case, namely, that the *Whelan* statements were the product of police coercion. It was within the realm of proper argument for the prosecutor to suggest, in rebuttal of that theory, that the police were not motivated by a desire to see the defendant convicted regardless of his guilt, but rather were motivated by a desire to apprehend the person actually responsible and bring him to justice.

4

The Claimed *Singh* Violation

Lastly, the defendant points to the assistant state's attorney's suggestion on numerous occasions in his

closing argument that in order for the jury to believe that Gilkenson and David Stebbins had told the truth at trial, and in order for them to believe that the defendant was not guilty, they must believe that the state's witnesses lied. For instance, in his initial closing argument, the prosecutor stated: "Make no mistake. Witnesses came in and lied. As jurors you'll have to determine which of the witnesses lied. Did each of the police officers that came in and testified deliberately lie to you in order to frame an innocent man *or* did the friends of the [defendant's] family come in here and lie to protect [the defendant]?" (Emphasis added.) Earlier, the prosecutor stated: "What David Stebbins and . . . Gilkenson want you to believe and what you have to believe, *if there is any truth to their testimony*, is that all the state police are concerned with is closing out this case by any means, fair or foul." (Emphasis added.) Finally, in rebuttal, the assistant state's attorney stated: "For you to believe that the defendant is innocent, you must believe that . . . Latour and . . . Harding are both lying. You must believe that when they got up on the stand and took that oath they committed perjury."

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that '[t]his form of argument . . . involves a distortion of the government's burden of proof.' *United States* v. *Reed*, [724 F.2d 677, 681 (8th Cir. 1984)]; accord *United States* v. *Vargas*, 583 F.2d 380, 387 (7th Cir. 1978) (noting that such comments excluded possibility that jury could have concluded only that witnesses were *probably* truthful and defendant was *probably* lying, thereby preventing jury from 'return[ing] a verdict of not guilty because the evidence might not be sufficient to convict the defendant beyond a reasonable doubt') . . . . Moreover, like the problem inherent in asking a defen-

dant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; emphasis in original.) *State* v. *Singh*, supra, 259 Conn. 709–10. The challenged remarks were improper, as gauged by these standards.

## B

### Expressions of Personal Opinion of the Moral Character of Defense Witnesses and of the Guilt of the Defendant

The defendant next claims that the assistant state's attorney improperly expressed his personal opinion impugning the moral character of certain defense witnesses, that these remarks were intertwined with comments on the credibility of the same witnesses,[17] and that the prosecutor used a pejorative to express his personal opinion regarding the defendant's guilt. In the beginning of his initial closing argument, the prosecutor stated: "It's a very sad commentary on the character [of] David Stebbins and . . . Gilkenson that their misguided sense of loyalty would outweigh the apprehension of a killer." Later, the prosecutor remarked: "Don't think for one minute that any one of these kids is a stand-up enough guy that he's gonna come in there— in here and take the rap for the other. . . . This is not Camelot and there is no chivalry here. This is the rabbit hole and in the rabbit hole there is not chivalry." The prosecutor also linked the "bad character" of Gilkenson and David Stebbins to his assertions that they were both lying, when he asked the jury whether, given that neither Gilkenson nor Stebbins had the "moral fortitude" to prevent the victim's death, the jury could "honestly believe for one minute that their character would prevent them from coming into court and lying to pro-

---

[17] Because we have already addressed this particular claim of the defendant in part II A of this opinion, we need not revisit it.

tect their friend?" In addition, in contrasting the testimony of Gilkenson and David Stebbins with their *Whelan* statements, the prosecutor stated: "Today they have no conscience. In their twisted world there is much more shame attached to being a snitch then there is in protecting a killer from justice. And [in] their misguided loyalty to their friend, [the defendant], they have reserved a place in hell for themselves." The prosecutor also remarked in this section of his argument that "[defense counsel] says nobody else was arrested but [the defendant]. None of these other kids have been arrested. The operative word there is 'yet.' David Stebbins . . . Gilkenson and Brandy Stebbins have not yet been arrested." Finally, the defendant points to the prosecutor's remarks that David Stebbins and Gilkenson had both "ratted out" the defendant.

The state has conceded that the majority of the remarks on the moral character of Gilkenson and David Stebbins were improper. We thus address two of the comments, the impropriety of which the state has not conceded, namely, the prosecutor's repeated reference to the defendant as a "killer," and his statements that Gilkenson and David Stebbins had "ratted out" the defendant. The repeated reference to the defendant as a "killer" was improper. " 'It is no part of a [prosecutor's] duty, and it is not his right, to stigmatize a defendant. He has a right to argue that the evidence proves the defendant guilty as charged in the indictment, but for the [prosecutor] himself to characterize the defendant as "a cold-blooded killer" is something quite different. No [defendant] on trial for murder can be officially characterized as a murderer or as "a cold-blooded killer," until he is adjudged guilty of murder or pleads guilty to that charge.' " *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see also *State* v. *Oehman*, supra, 212 Conn. 335 (prosecutor's com-

ment that defendant was " 'spoiled killer' " was improper). The prosecutor's repeated references to the defendant as a "killer," therefore, were improper comments on the defendant's guilt.

The prosecutor's remarks, however, that Gilkenson and David Stebbins had "ratted out" the defendant were not improper. The defendant claims that these remarks were the equivalent of calling the defense witnesses "rats." See *State* v. *Couture*, supra, 194 Conn. 561 (improper for prosecutor to characterize defendant and codefendant as " 'rats' "). We disagree. The prosecutor merely attempted to characterize the *Whelan* statements from the hypothetical perspective of Gilkenson and David Stebbins in order to suggest an explanation for their recantation, that is, he suggested that *they* believed that in their *Whelan* statements they had "ratted out" the defendant. These remarks were not improper pejoratives, but rather permissible comments on the evidence.

C

Appeal to the Jurors' Passions

Finally, the defendant contends that the prosecutor improperly appealed to jurors' emotions through his comments regarding the moral character of defense witnesses, and through the suggestion that the jurors should seek justice for the victim's family. "A prosecutor . . . may not appeal to the emotions, passions and prejudices of the jurors . . . or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 163.

As we have noted in part II B of this opinion, the state has conceded that the remarks regarding the character of defense witnesses were improper. We need

only address, therefore, the prosecutor's remarks regarding the victim's family. Specifically, he stated: "The parents of [the victim] don't want someone arrested for this offense. They want the person that killed their son brought to justice." The defendant claims that this remark suggested to the jury that the victim's parents believed that he was guilty, and that the jury should consider that in deliberating on his guilt.

We agree that the remark was improper because it improperly appealed to the passions of the jurors by suggesting that in order to grant justice to the victim's family, the jurors should find the defendant guilty. See, e.g., *State* v. *Hart*, 691 So. 2d 651, 660 (La. 1997) (prosecutor improperly exhorted jurors " 'to do justice in this case for this family' "); *State* v. *Brown*, 320 N.C. 179, 202–203, 358 S.E.2d 1 (remark that jurors should find defendant guilty in order to grant justice to victim's family improper, but in absence of objection, trial court not required to correct it sua sponte), cert. denied, 484 U.S. 970, 108 S. Ct. 467, 98 L. Ed. 2d 406 (1987). Such remarks urged the jurors to decide the case based, not on the evidence, but rather on their sympathy for the victim's family, and thus constituted an improper appeal to the jurors' emotions.

## D

### Suggestion That the Jurors' Oath Required the Return of a Guilty Verdict

The defendant next claims that the prosecutor improperly suggested that the jurors' oath required the return of a guilty verdict, thus equating justice with a conviction. Specifically, the assistant state's attorney stated: "[At] the beginning of the trial each of you took an oath. You said you were [going to] listen to the evidence and you were [going to] render a verdict in accordance with that evidence. The evidence is clear that the defendant was the person who killed [the vic-

tim] on the evening of April 18, 1998. It's now time that you held him accountable for his actions." "[I]t generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from its duty of deciding the case on the basis of the evidence and the applicable law." *State* v. *Reynolds*, supra, 264 Conn. 183. In determining whether the remarks were likely to have had such an effect, however, we must examine them in context. The remarks at issue did not suggest that the jury decide the issue on a basis other than the evidence and the applicable law. On the contrary, the prosecutor reminded the jurors that their oath required them to return a verdict *in accordance with the evidence.* Simply because he completed the syllogism and stated that the evidence supported a finding of guilty, did not render the remark improper.

## E

### Reference to Facts Not in Evidence

The defendant claims that the prosecutor referred to facts not in evidence by: (1) using testimony that was admissible solely for impeachment purposes as if it were substantive evidence; and (2) mischaracterizing the results of the gunshot residue test as evidence that either David Stebbins or Gilkenson hid the gun. We agree with the first claim, but disagree with the second claim.

The defendant first claims that the prosecutor improperly relied on certain testimony of Erin Whalen, who was at the party that night, for its substance, in violation of the trial court's ruling that the testimony was admissible only for impeachment purposes. The defendant therefore contends that the prosecutor's comments improperly referred to facts not in evidence. At trial, Whalen testified that, at one point during the

evening of April 18, 1998, David Stebbins told her that if anyone were to "mess with him that he had three guns in the trunk of his sister's car." The trial court ruled, however, that the statement was admissible solely for impeachment purposes. Nevertheless, the defendant contends, the assistant state's attorney improperly relied on Whalen's testimony regarding David Stebbins' statement for its substance. Specifically, in support of his contention that the gun most likely belonged to David Stebbins, the prosecutor stated: "Whalen also testified that during the evening of the [eighteenth, David Stebbins] was bragging about having brought weapons to the party. 'I don't know why these guys are picking on me. I have guns in the car.' " Subsequently, the prosecutor stated: "We also know that the shooter came from Brandy Stebbins' car because of David Stebbins and what he told Officer Berard and . . . Whalen. During the evening, David Stebbins was bragging about having weapons in the car."

The remarks were improper. "It is improper for a prosecutor to use prior oral inconsistent statements substantively." *State* v. *Williams*, supra, 204 Conn. 544. The trial court had ruled that Whalen's testimony regarding David Stebbins' prior inconsistent oral statement should be used solely for impeachment purposes. Contrary to that ruling, the prosecutor twice relied on Whalen's testimony for its substance, asking the jury to infer based on David Stebbins' statement that the gun was in Brandy Stebbins' car and, therefore, that the shooter came from that car. The state argues that the prosecutor's use of Whalen's testimony properly relied on the testimony for impeachment purposes, because Whalen's testimony necessitated a rejection of David Stebbins' testimony that there were no weapons in the car. We do not agree. This argument misconstrues the basic distinction between impeachment evidence

and substantive evidence. We do note, however, that there was ample other evidence that there was a rifle in Brandy Stebbins' vehicle.[18] Thus, this improper use of the impeachment evidence was not likely to have misled the jury.

The defendant next claims that there was no evidence to support the state's theory that either Gilkenson or David Stebbins hid the gun and that the state therefore improperly argued facts not in evidence in advancing this theory. We disagree. During rebuttal, the prosecutor argued that "[w]e can be reasonably certain" that either David Stebbins or Gilkenson removed the gun from the car and hid it. In support of its theory, the state noted that the gunshot residue tests revealed the presence of lead on both Gilkenson's and David Stebbins' hands, and that this evidence was consistent with its theory that both of them had handled the weapon sometime during the evening. The prosecutor also noted that either Gilkenson or David Stebbins would have had ample time to hide the weapon. Contrary to the defendant's assertion, therefore, that the state's argument was baseless, the prosecutor reasonably presented the state's theory based on the evidence.

F

Due Process Analysis

We now turn to the question of whether the established improprieties "so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 723. As we mentioned earlier

___

[18] That evidence included: (1) Latour's testimony that David Stebbins removed a rifle from the vehicle and aimed it at him; (2) Latour's testimony that the defendant exited Brandy Stebbins' vehicle holding what looked like a rifle; and (3) David Stebbins' *Whelan* statement that the defendant stuffed a rifle in his pant leg before they left to go to the party, and that, when they arrived at the party, the defendant left the rifle in the backseat of the car.

in part II of this opinion, "[i]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 164. We now examine each of these factors in turn. That examination leads us to conclude that the defendant was not deprived of his right to a fair trial by the prosecutorial misconduct in the present case.

1

Whether the Misconduct Was Invited

The state claims that the prosecutor's comments regarding the credibility of witnesses were invited by three remarks made by defense counsel. First, in regards to Latour, defense counsel told the jury that they could decide whether he was "telling tales to people about this case." Second, when pointing out the various inconsistencies in Latour's testimony, defense counsel stated, "[t]here's . . . lots of little details of people just not being honest." Lastly, defense counsel at one point referred to a defense witness, Comeau, as a "credible" witness. Nothing in these remarks, however, invited the established improper comments by the assistant state's attorney. For example, it can hardly be claimed that those comments by defense counsel invited the state's comment that, in order for the jury to believe the defense witnesses, it *must* believe Latour lied. Nor can it reasonably be argued that the defense's

comments invited the prosecutor's improper remarks regarding the moral character of defense witnesses. The state points to no other comments by defense counsel that invited the improper comments, nor does our review of the transcript reveal any such remarks.

2

### The Frequency and Severity of the Misconduct

We next examine whether the misconduct was frequent and severe. The misconduct was frequent. The prosecutor repeatedly made improper remarks throughout his closing argument, both in his initial closing statement and on rebuttal. Although the misconduct was frequent, it was not, for the most part, severe. We first note that we consider it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, "presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial."[19]

[19] We disagree with the dissent's contention that our consideration, during our analysis of whether the prosecutorial misconduct deprived the defendant of a fair trial, of the defendant's failure to object to the improper remarks raises a question of fundamental fairness. We acknowledge that the dissent's argument has an initial appeal. It may at first appear unfair that a defendant's failure to object results both in a more demanding standard of review and forms a part of the substantive analysis of whether the defendant was deprived of his due process right to a fair trial. Because our ultimate concern in addressing claims of prosecutorial misconduct, however, is to determine the answer to that question, namely, whether the defendant was in fact deprived of a fair trial by the misconduct, we must consider *any* persuasive evidence that aids us in arriving at that determination, regardless of whether that information also dictates the standard of review. The failure of the defense counsel to object to the improper remarks of the assistant state's attorney is highly persuasive evidence that the remarks did not deprive the defendant of a fair trial because defense counsel was in the best position to hear the remarks as prejudicial, and the one most likely to do so. Therefore, because the defense counsel's failure to object is both relevant and persuasive evidence that the misconduct did not violate the due process rights of the defendant, we consider that failure to object, not only as the trigger for review under *State* v. *Golding*, supra, 213 Conn. 239–40, but also as part of our substantive analysis of whether the defendant may prevail under *Golding*.

*State* v. *Reynolds*, supra, 264 Conn. 165. Given the defendant's failure to object, only instances of grossly egregious misconduct will be severe enough to mandate reversal. Only one of the prosecutor's remarks was egregious, namely, the prosecutor's remark that suggested that there were charges pending against David Stebbins, Gilkenson and Brandy Stebbins. We agree with the Appellate Court that it was "inexcusable" for the prosecutor to suggest that defense witnesses were facing impending charges. *State* v. *Thompson*, supra, 69 Conn. App. 308. The question before us, however, is not whether the prosecutor should be reprimanded, but whether the remark deprived the defendant of a fair trial. We do not agree that the remark was sufficiently egregious to mandate reversal.

Moreover, the remaining comments were not egregious. We address specifically the prosecutor's comment that Gilkenson and David Stebbins had "reserved a place in hell for themselves." We disagree with the Appellate Court that in this remark, which the state has conceded was improper, the prosecutor expressed himself "in a most inflammatory and vitriolic" manner. Id., 307. Although we recently have concluded that religious references in closing argument may be improper; see *State* v. *Ceballos*, 266 Conn. 364, 389–90, 832 A.2d 14 (2003); that conclusion does not mean that all references to religion mandate reversal. We do not believe that the religious reference in the present case "viewed in the collective with other [improper] statements . . . [was] substantially prejudicial such that the fundamental fairness of the trial was adversely impacted." Id., 390.

3

The Centrality of the Misconduct to Critical Issues in the Case and the Strength of the State's Case

Some of the misconduct in the present case, namely, the misconduct that implicated the credibility of wit-

nesses, was *arguably* central to the critical issues in the case. Unlike *State* v. *Ceballos,* supra, 266 Conn. 416, the present case does not involve solely a "credibility contest" between the state's witnesses and the defense witnesses. In *Ceballos,* during our due process analysis, we assessed the centrality of the misconduct to critical issues in the case in conjunction with our evaluation of the strength of the state's case. Id., 417. Because we concluded that there was no "independent physical evidence" substantiating the state's allegations that the defendant had sexually assaulted the victim, "the significance of the assistant state's attorney's improper conduct increase[d] considerably." Id., 416–17. Exactly the opposite principle is at work in the present case—that is, contrary to the defendant's contentions, the state's case against him was strong, and the testimony of the state's witnesses was corroborated by the physical evidence, as well as the behavior of the defendant following the shooting. The testimony of Latour and Harding placed the defendant at the site of the shooting, with a rifle in his hand, at precisely the time that numerous witnesses heard the rifle discharge. This testimony was corroborated by the gunshot residue test of the white jacket worn by the defendant that evening. That test was consistent with the state's theory that the defendant was the shooter, showing the presence of lead and antinomy on the jacket. Furthermore, the defendant's bizarre behavior upon returning to the scene of the crime, shouting, " 'I didn't shoot him. Just arrest me,' " was consistent with consciousness of guilt. Similarly, the defendant's violent and hostile behavior while being interviewed by detectives after he was arrested for breach of the peace supported the state's case against him. Perhaps one of the most telling pieces of evidence was the defendant's own statement during that interview: " 'What did he get shot with a .22?' " That the defendant knew before any of the investigating team

the caliber of the fatal weapon was strongly indicative of consciousness of guilt. Furthermore, the defendant's spontaneous statement to Luberto, the next day, that he did not know how to load a .22 caliber rifle, provided further support for the inference that the defendant knew the caliber of the weapon. All of this evidence of guilt was corroborated by the *Whelan* statements of Gilkenson and David Stebbins, who both stated, in separate interviews, that the defendant got into the car holding a rifle and told them that they had better get out of there because he thought that he had hit someone. All of this evidence, taken together, although not overwhelming, was strong evidence of the defendant's guilt. Finally, we note that, although the defendant was charged with murder, the jury convicted him of the lesser included offense of reckless manslaughter in the first degree with a firearm. This is an indication that the jury made its finding rationally, based on the evidence, and was not unduly swayed by the instances of prosecutorial misconduct.

We disagree with the Appellate Court's conclusion that, because the state's case against the defendant was based on circumstantial evidence, and because witnesses offered differing versions of the events on the night of the shooting, "the evidence of guilt was not so overwhelmingly strong that the misconduct could not have improperly influenced the jury." *State* v. *Thompson*, supra, 69 Conn. App. 313. First, we see no reason why the nature of the evidence as circumstantial rather than direct should bear on the assessment of the strength of the state's case. Indeed, in the context of a claim that the evidence was insufficient to sustain a finding of guilt, we have stated that "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes

guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000). Second, we have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial misconduct did not deprive the defendant of a fair trial. Indeed, despite the Appellate Court's emphasis on the differing witness accounts, this is not a case that rested solely on the credibility of witnesses. That fact alone distinguishes this case from cases such as *State* v. *Singh*, supra, 259 Conn. 693, and *State* v. *Ceballos*, supra, 266 Conn. 364, both of which rested almost exclusively on the jury's assessment of the credibility of witnesses. Contrary to those cases, in the present case, the physical evidence corroborated the incriminating testimony of the state's witnesses, and the defendant's own statements and behavior offered further corroboration of that evidence.

4

Curative Instructions

The trial court gave no specific curative instructions. We note in this regard, however, that "the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to

it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error contemplated by the third prong of *State* v. *Golding*, supra, 213 Conn. 240, namely, that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . . Put differently, *Golding* review of prosecutorial misconduct claims is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived a criminal defendant of his right to a fair trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414–15.

In addition, even though the trial court gave no specific curative instructions, the court reminded the jury in its general instructions: "You alone are responsible for determining the facts. It is your exclusive province to deal with the evidence and determine what the real facts were and to reach the final conclusion as to the guilt or innocence of the defendant. . . .

"Also, your verdict must be based absolutely and solely upon the evidence given to you in the course of the trial. You should not be swayed or influenced by any sympathy or prejudice for or against anyone: the state; the accused; the victims; their families . . . [or] anyone else. . . .

"Now you should keep in mind that the arguments and statements by the attorneys in final argument or during the course of the trial are not evidence. You should not consider as evidence their recollections of the evidence nor their personal beliefs as to any facts which any attorney may have presented to you in argu-

ment from that attorney's knowledge which was not presented to you as evidence during the course of the trial." "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." *State* v. *Reynolds*, supra, 264 Conn. 131. There is no suggestion in the present case that the jury did not follow the trial court's general instructions.

## III

### SUPERVISORY AUTHORITY

As an alternate ground for affirmance, the defendant contends that we should invoke our supervisory authority to uphold the judgment of the Appellate Court reversing the defendant's conviction. We decline to do so in the present case.[20]

"[E]ven when prosecutorial misconduct is not so egregious as to implicate the defendant's [due process] right to a fair trial, an appellate court may invoke its supervisory authority [over the administration of justice] to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Thus, in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the

---

[20] We note that the state contends that the defendant's claim that this court should exercise its supervisory authority based on the prosecutor's use of Whalen's testimony for substantive purposes in closing argument is unreviewable because it was not raised to the Appellate Court and because it does not raise an issue of constitutional magnitude. We already have ruled on this issue in granting the defendant's motion to raise this claim as an alternate ground for affirmance, and we decline to reconsider our decision.

drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future. . . . Accordingly, [r]eversal of a conviction under [our] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Citations omitted; internal quotation marks omitted.) Id., 165–66.

We do not believe that the instances of misconduct in the present case were "so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) Id., 165. Therefore, we conclude that this case does not present an appropriate circumstance justifying the invocation of our supervisory authority.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion SULLIVAN, C. J., NORCOTT and ZARELLA, Js., concurred.

KATZ, J., dissenting. The majority concludes, in reversing the Appellate Court's judgment, that, despite frequent improper remarks by the state's attorney that "arguably [were] central to the critical issues in the case," the defendant, Ryan Thompson, was not deprived of a fair trial. I disagree.

The Appellate Court identified three categories of remarks by the state's attorney in his closing argument as misconduct, which it found to be the most egregious

of the improprieties alleged by the defendant.[1] See *State* v. *Thompson*, 69 Conn. App. 299, 304–306, 797 A.2d 539

[1] The Appellate Court identified the following remarks by the state's attorney in his closing argument: " 'Don't think for one minute that any of these kids is a stand-up enough guy that he's gonna come in there—in here and take the rap for the other. Just as [Jared] Gilkenson and [David] Stebbins would give up [the defendant] to protect themselves, we know [the defendant] would do the same if the shoe had been on the other foot. [The defendant] is not gonna risk a lengthy jail term to protect David [Stebbins] or [Gilkenson]. If he was not the shooter and he knew who was, he would have told you that. This is not Camelot, and there is no chivalry here. . . . These kids will protect themselves first. Then, and only then, will they protect each other. That's what happened in this case. While it was [the defendant's] finger that pulled the trigger, without David Stebbins and [Gilkenson], [the victim] would be alive today. Had either of those individuals been able to put aside their wounded pride, none of us would be in this courtroom today. [The defendant's attorney] says nobody else was arrested but [the defendant]. None of these other kids have been arrested. The operative word is "yet." David Stebbins, [Gilkenson] and Brandy Stebbins have not yet been arrested. When you read the statements of [Gilkenson] and David [Stebbins], it is very obvious that they knew exactly what they were saying. Those statements indicate that both [Gilkenson] and David [Stebbins] know that it is not a crime to sit by and watch as [the defendant] jumped out of the car and shot someone. But all they needed to say was, "Come on, Ryan. Let's go home. The party's over." The fact that they didn't do so is reprehensible. The fact that they would come into court and lie to protect him is even more reprehensible. If neither one of those kids had the moral fortitude to prevent [the victim's] death, do you honestly believe for one minute that their character would prevent them from coming into court and lying to protect their friend? . . . On the day following this shooting, [Gilkenson] and David Stebbins knew that they had taken part in the killing of another human being. When the police confronted them, they truthfully told the police who amongst them was responsible. Today, they have no conscience. In their twisted world, there is much more shame attached to being a snitch than there is in protecting a killer from justice. And [in] their misguided loyalty to their friend, [the defendant], they have reserved a place in hell for themselves.' " *State* v. *Thompson*, 69 Conn. App. 299, 305–306, 797 A.2d 539 (2002).

The court also noted the following remarks by the state's attorney: " 'It is only natural that David [Stebbins] and [Gilkenson] would feel guilty about ratting out their friend. However, it's not until [three days after giving their original statements] that either one of these individuals begin to change their stories. It's a very sad commentary on the character [of] David Stebbins and [Gilkenson] that their misguided sense of loyalty would outweigh the apprehension of a killer. It's even sadder to think that the parents would rather see a killer escape justice than to admit to the world or even to themselves that their children had anything to do with this incident.' " Id., 306.

(2002). In particular, it concluded that certain remarks by the state's attorney, including a remark that certain witnesses " 'have reserved a place in hell for themselves' "; id., 306; constituted statements that "exceeded all bounds of acceptable conduct" because they were religiously charged and inflammatory statements of the type universally condemned by courts. Id., 307. The Appellate Court further identified several remarks by the state's attorney suggesting that certain witnesses offering testimony favorable to the defendant were facing arrest for the same incident. Id., 308. The court condemned these remarks because although the state had not produced any evidence in support thereof, the remarks suggested that the state had such evidence, thereby diverting the jury from the evidence properly before it. Id., 308–309. Finally, the Appellate Court cited six instances in which the state's attorney had vouched for the veracity of Robert Latour, a key state's witness, creating a further risk that the jury might conclude that the state's attorney had "access to matters not in evidence" to support Latour's credibility. Id., 310. The court concluded that these three categories of remarks were sufficiently prejudicial to deprive the defendant of a fair trial.

I fully concur with the Appellate Court's thorough and cogent analysis. Indeed, as the majority notes, the state concedes that the first two categories of remarks were improper. Any doubt that I may have had, however, as to whether the state's attorney's misconduct in this case was sufficiently egregious as to warrant reversal of the defendant's conviction is resolved by resort to the other improprieties acknowledged by the majority. Specifically, the majority identifies as improper the following remarks by the state's attorney.

First, the state's attorney's remark that Jared Gilkenson and David Stebbins were lying when they recanted their previous statements implicating the defendant.

The majority concludes that "[a]lthough it is not improper to comment on a witness' motive to lie, these particular remarks went beyond such permissible argument because they were inextricably linked to the prosecutor's conceded improper comments on the moral character of Gilkenson and David Stebbins . . . ."

Second, the state's attorney's statement that when Gilkenson and David Stebbins gave their initial statements, which they later recanted, they "truthfully told the police who amongst them was responsible." The majority concludes that the comment was improper because it was not tied to any evidence and vouched for those witnesses' testimony.

Third, the state's attorney's numerous comments that, in order to believe that Gilkenson and David Stebbins subsequently had testified truthfully at trial and that the defendant was not guilty, the jury had to believe that the state's witnesses had lied. The majority cites our recent decision in *State* v. *Singh*, 259 Conn. 693, 709–10, 793 A.2d 226 (2002), condemning such conduct, in which we noted that "[t]his form of argument . . . involves a distortion of the government's burden of proof . . . [and that] such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; internal quotation marks omitted.)

Fourth, the state's attorney's repeated reference to the defendant as a "killer." The majority concludes that such references improperly stigmatize a defendant prior to a judgment of guilt.

Fifth, the state's attorney's comments during his closing statement: "The parents of [the victim] don't want someone arrested for this offense. They want the person that killed their son brought to justice." The majority concludes that these remarks "improperly appealed to the passions of the jurors by suggesting that in order

to grant justice to the victim's family, the jurors should find the defendant guilty," thereby urging them to decide the issue based on their sympathy to the victim's family, rather than on the evidence.

Finally, the state's attorney's two references to testimony by Erin Whalen, a state's witness, for its substance, in violation of the court's ruling that it was admissible only for impeachment purposes. The majority notes the well established rule that "[i]t is improper for a prosecutor to use prior oral inconsistent statements substantively." *State* v. *Williams*, 204 Conn. 523, 544, 529 A.2d 653 (1987).

I would conclude that these statements, viewed in their totality, were sufficiently egregious so as to have deprived the defendant of a fair trial. Indeed, the majority acknowledges that several of the factors that we consider in evaluating whether the misconduct constituted a violation of due process weigh in favor of the defendant. See *State* v. *Singh*, supra, 259 Conn. 723 (noting that factors to be considered include "the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case"). Specifically, the majority concludes that the remarks were not invited by defense counsel and that the remarks were frequent. The majority further concludes that, while the misconduct was "arguably central to the critical issues in the case . . . the state's case against [the defendant] was strong" and the misconduct did not deprive the defendant of a new trial.

As to the factors weighing against reversal of the judgment of conviction, the majority concludes that the state's evidence, "although not overwhelming, was strong evidence of the defendant's guilt." It also notes

that the misconduct by the state's attorney "was not, *for the most part,* severe." (Emphasis added.) Finally, the majority concludes that the defendant's failure to object to the improprieties both adversely impacts its ability to determine the severity of the misconduct and the effectiveness of any curative instruction.[2]

Even if I were to accept, arguendo, all of the majority's conclusions, I agree with the Appellate Court that, "the frequency and gross impropriety of the [state's attorney's] comments caused the defendant substantial prejudice and infringed on his right to a fair trial. 'In Connecticut the appropriate remedy for an unfair trial due to prosecutorial misconduct is to vacate the judgment of conviction and to grant a new trial.' *State* v. *Ubaldi,* 190 Conn. 559, 570, 462 A.2d 1001, cert. denied,

---

[2] I note that the majority's approach further underscores a question of fundamental fairness that arises in circumstances in which the defense counsel has failed to object to alleged improprieties at trial. In such circumstances, the defendant first is required to overcome the hurdle for review of unpreserved claims set forth in *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). If the defendant overcomes that obstacle, the court imposes a second hurdle not imposed on preserved claims by viewing with heightened skepticism any claims of prejudice. See, e.g., *State* v. *Reynolds,* 264 Conn. 1, 165, 836 A.2d 224 (2003); *State* v. *Andrews,* 248 Conn. 1, 19–20, 726 A.2d 104 (1999); *State* v. *Robinson,* 227 Conn. 711, 745–46, 631 A.2d 288 (1993). Finally, as the present case demonstrates, the defense counsel's failure to object tips the scales against the defendant on two of the factors to be considered in determining whether there was reversible error.

As this court previously has recognized, however, it is "primarily . . . the responsibility of the defense counsel to protect the rights of his client by taking appropriate action to alert the trial court to claims that those rights are being jeopardized. . . . Nonetheless, in a case of serious and repeated prosecutorial misconduct . . . the trial court has an independent responsibility to intervene, even in the absence of an objection or motion by defense counsel." *State* v. *Williams,* supra, 204 Conn. 549; see *Harris* v. *United States,* 402 F.2d 656, 657 (D.C. Cir. 1968). Indeed, as the former Chief Judge of the United States Circuit Court of Appeals for the District of Columbia explained, "it would be ignoring the realities of criminal practice to place such a heavy emphasis on the adversary system" by determining the fairness of the trial based on the defense counsel's failure to object. *Harris* v. *United States,* supra, 659 (Bazelon, C. J., concurring).

464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983)."
*State* v. *Thompson*, supra, 69 Conn. App. 313–14.

Accordingly, I respectfully dissent.