### STATE OF CONNECTICUT *v.* ALAN GOODSON
### (AC 24196)

Dranginis, Bishop and West, Js.

Argued March 30—officially released September 7, 2004

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's

attorney, and *John M. Waddock*, supervisory assistant state's attorney, for the appellee (state).

WEST, J. The defendant, Alan Goodson, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), murder as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-54a (a), and hindering prosecution in the first degree in violation of General Statutes (Rev. to 1997) § 53a-166 (a). On appeal, the defendant claims that (1) he was deprived of his sixth amendment right to confrontation when the trial court improperly admitted into evidence, over his objection, the prior testimony of a reluctant eyewitness pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), (2) he was deprived of a fair trial by the prosecutor's knowing use of, and failure to correct adequately, the false testimony of a state's witness[1] and (3) he was deprived of a fair trial as a result of several alleged instances of prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts, which, because of the nature of the due process claim, we must set out in detail. On September 25, 1997, the defendant drove his gold Oldsmobile Delta (gold Delta) to the home of Tracy Daniels in the Westville

---

[1] Although the claim is of the prosecutorial misconduct variety, the defendant chose to separate it from the other alleged instances of misconduct. We note, however, that because a due process analysis "must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves." *State* v. *Stevenson*, 269 Conn. 563, 574, 849 A.2d 626 (2004). Accordingly, we address all of the defendant's allegations of prosecutorial misconduct together under a single due process analysis.

section of New Haven and stayed the night. The following morning, the defendant drove Daniels' son to a day care center on Union Avenue in downtown New Haven, a short distance from the location on Congress Avenue where the victim, Dennis Carr, Jr., was shot and killed later that morning. At approximately 8:30 a.m., Curtis Hannans received a telephone call from his girlfriend, Delores Lopez, asking him to visit her at her home. Hannans, who lived with his mother and his brother, Jermaine Young, in West Haven, borrowed the keys to a blue Mazda MX-6 (blue Mazda) from Young. According to Hannans, the blue Mazda belonged to the defendant but was in Young's possession on the morning of September 26, 1997. Cellular telephone records indicate that the defendant placed a call to Young at 8:46 a.m. The day care center's records indicate that Daniels' son arrived at the center at 8:50 a.m.

According to Lopez, Hannans arrived in the blue Mazda at her home at approximately 8:50 a.m. Lopez immediately borrowed the blue Mazda to take a short drive to a store and, on returning to her home, saw a gold Delta parked in her driveway. The defendant, Young and Young's son were waiting in Lopez' backyard and asked for Hannans. Hannans met the visitors outside, conversed with the defendant and Young, and retrieved the keys to the blue Mazda from Lopez. According to Lopez, Hannans gave the keys to Young. Hannans testified that the keys ultimately were given to the defendant and that the defendant and Young promptly drove off in the blue Mazda. Hannans had received the keys to the gold Delta from the defendant and immediately returned to his mother's house with his nephew.

Between 9 a.m. and 10 a.m., a large group of people, including the victim and Stacey Footman,[2] had congre-

[2] Footman had struck Hannans and had stolen the chain from around his neck on September 23, 1997. Footman testified that he stole Hannans' chain because he recognized him as Young's brother and wanted to retaliate for a fight that had occurred a week before between himself, Young and others

gated in the driveway of 711-719 Congress Avenue. At the same time, Carl Harrison was relaxing in his parked car close to the driveway. Two individuals in a blue Mazda drove alongside Harrison's car. Roosevelt Green, one of the men in the driveway, identified the car as the blue Mazda that frequently was driven by the defendant in the neighborhood. The passenger of the blue Mazda pulled a mask over his face, revealed a gun and fired several gunshots. He shot the victim in the head, killing him. The blue Mazda drove off, and Harrison gave chase in his car. Police arrived at the scene at approximately 9:55 a.m. Harrison's August 12, 1999 testimony from Young's suppression hearing was admitted into evidence at the defendant's trial pursuant to *State v. Whelan,* supra, 200 Conn. 753. At Young's suppression hearing, Harrison testified that he was able to see the faces of both men in the blue Mazda. He testified that he had recognized the defendant as the driver.

According to Hannans, Young returned to their mother's house approximately one-half hour after he saw him depart from Lopez' house with the defendant in the blue Mazda. Young retrieved the keys to the gold Delta from Hannans and promptly left. The manager of an Auto Specialist body shop in West Haven, Russell Mansfield, testified that the defendant drove a blue Mazda into the shop during the morning hours of September 26, 1997, in the company of an individual driving

at a nightclub. When asked during cross-examination if he had told the police on September 30, 1997, that the defendant was involved in the fight between himself, Young and others at the nightclub, Footman conceded that he "[m]ight have." According to Hannans, Footman ran away with his chain and warned, "[t]ell your brother and [them] don't call the cops, either." Hannans also testified that he chased after Footman in the blue Mazda, pursuing him through a cemetery "[f]or probably a hot minute," in an attempt to recover his chain. When asked on cross-examination by defense counsel whether or not he had hoped to "run [Footman] down" in the blue Mazda, Hannans replied: "Um, I really can't say, to be honest. I was kind of mad. I don't know what I would have did."

a gold Oldsmobile. The defendant requested that his car be repainted gold and negotiated all of the terms of the transaction. The defendant signed the work order form, but also wrote the name "Eric Dennis" in parentheses. According to Mansfield, the defendant later returned to pick up the Mazda, now repainted gold, accompanied by the same individual who initially helped him drop it off and a third individual. The defendant paid for the work done to the Mazda.

At trial, Dennis, who described himself as good friends with the defendant at the time of the shooting,[3] testified that during September, 1997, the Mazda was registered in his name at the defendant's request, even though the car did not belong to him. He also testified that the defendant alerted him to the possibility that the police might contact him concerning some issue with the blue Mazda. Dennis further testified that he lied to the police on October 8, 1997, when he told them that he was the only individual who possessed the car or had access to it around the time of the shooting. Moreover, Dennis testified that he fabricated, at the defendant's request, his entire October 8, 1997 statement to the police concerning his connection with the blue Mazda.[4]

---

[3] Dennis also testified that he had "[l]ooked up to [the defendant] as a brother."

[4] The following colloquy occurred during the direct examination of Dennis by the prosecutor:

"[The Prosecutor]: Can you tell us, sir, why it was that you told police the story that you just indicated you gave them, on October 8, 1997?

"[The Witness]: At the time, at the time, I kind of thought I was doing myself a favor, but I was only digging myself deeper into another hole.

"[The Prosecutor]: Okay. When you say, doing yourself a favor, were you trying to do yourself a favor?

"[The Witness]: Not really.

"[The Prosecutor]: Who were you trying to do a favor for?

"[The Witness]: A friend.

"[The Prosecutor]: Who? Which friend is that?

"[The Witness]: [The defendant.]

"[The Prosecutor]: How do you mean that, sir?

"[The Witness]: In other words, the story was, the story was, um, you

Finally, Eric Canty, an individual who knew the defendant from having spent time around the Congress Avenue section of New Haven, testified that he had confronted the defendant in prison in January, 2001, concerning the role the defendant played in causing the victim's death. According to Canty, he specifically accused the defendant of shooting Canty's friend, the victim. Canty testified that the defendant responded that Young was the shooter and that he merely drove the car involved.

On the basis of the weight of the testimony elicited at trial, the circumstantial evidence, the consciousness of guilt evidence, the work order signed by the defendant to repaint the blue Mazda on the morning of the shooting, the eyewitness identification of the defendant as provided in the former testimony of a *Whelan* declarant and an alleged incriminating statement made by the defendant to the victim's friend in prison, the jury found the defendant guilty of all three counts. The defendant was sentenced to a total term of fifty-five years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted under *Whelan* the transcript of Harrison's testimony from Young's suppression hearing, as well as photographs Harrison had identified during that testimony as being of the defendant and Young, thereby violating the defendant's sixth amendment right to confrontation. Specifically, the defendant argues that Harrison's repeated answer of "I don't recall" on both direct and cross-examination constituted a calculated effort

know, I was told what to say, as far as to the police.

"[The Prosecutor]: And who told, who gave you that story to provide to the police?

"[The Witness]: [The defendant.]"

on his part to undermine the integrity of the proceedings, and rendered Harrison not subject to cross-examination in conflict with both the sixth amendment right to confrontation and the requirement of *State* v. *Whelan*, supra, 200 Conn. 753. We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. At trial, the state called Harrison to testify. On direct examination, Harrison recalled being present at the driveway of 711-719 Congress Avenue at the time of the shooting. He also acknowledged that his initials appeared on a sworn statement given to detectives and on photographs of the defendant and Young that had been used at Young's suppression hearing by him to identify those two men as the same individuals he had observed driving in the blue Mazda at the time of the shooting. He could not recall, however, meeting with authorities after the shooting to discuss the matter or testifying in court on August 12, 1999, under oath, about what he saw on the morning of September 26, 1997. As Harrison explained during direct examination: "The past is the past."[5] After direct examination had concluded, the state offered into evidence, under *Whelan*, Harrison's testimony from Young's suppression hearing. The defendant objected to the offer on the basis of the sixth amendment right to confrontation and *Whelan*'s requirement that the wit-

---

[5] The following colloquy occurred during the prosecutor's direct examination of Harrison:

"[The Prosecutor]: All right. Do you recall coming into court after you gave a statement to police and the inspector from the state's attorney's office, and testifying in a courtroom, such as this, under oath? Do you remember coming into court on that?

"[The Witness]: I don't recall.

"[The Prosecutor]: No recollection, whatsoever, about coming into court?

"[The Witness]: No. The past is the past.

"[The Prosecutor]: I'm sorry?

"[The Witness]: I said, the past is the past.

"[The Prosecutor]: I understand.

"[The Witness]: I don't recall about the past."

ness be subject to cross-examination. The court admitted into evidence Harrison's testimony from Young's suppression hearing and the photographs referenced in that testimony. The testimony was then read to the jury.

During cross-examination, Harrison continued to respond to most questions with the answer, "I don't recall."[6] When asked if a certain sentence modification pending at the time of Young's suppression hearing was subsequently granted in his favor, however, Harrison responded in the negative. When defense counsel returned to that issue later in his cross-examination, Harrison offered a terse reply: "Why would I want a sentence modification? I did all my, damn near all my time?" Undaunted, defense counsel asked Harrison if he had made up the "whole story" at Young's suppression hearing about having been able to identify the defendant as the driver at the time of the shooting in order to

---

[6] The transcript reveals how reluctant Harrison was to testify at the defendant's trial. The following colloquy occurred during the cross-examination of Harrison by defense counsel:

"[Defense Counsel]: And you said [to the police on September 30, 1997] that the suspect vehicle had fled from the driveway between 711 and 719 Congress Avenue traveling south, over to Redfield Street, west onto Congress Avenue, northwest onto Washington Avenue, south onto the Boulevard, toward the interstate entrance, isn't that true?

"[The Witness]: I don't recall.

"[Defense Counsel]: And you claim you lost sight of the vehicle, some time around the left turn over on Washington Avenue onto the Boulevard, isn't that true?

"[The Witness]: I don't recall.

"[Defense Counsel]: You told Inspector Kelly you weren't able to get the auto registration, isn't that true?

"[The Witness]: I don't recall.

"[Defense Counsel]: You also told Inspector Kelly that, you advised him that identification of the suspect auto was possible, isn't that true?

"[The Witness]: I don't recall.

"[Defense Counsel]: And you never told Inspector Kelly, at that time, that you were able to identify anybody, isn't that true?

"[The Witness]: I don't recall. I can't even hear you, to tell you the truth.

"[Defense Counsel]: Okay. Do you want me to repeat that question?

"[The Witness]: No."

obtain a sentence modification. Harrison responded: "I don't need no sentence modification. I know how to do time." When asked if he had told a detective that he had been lying down, asleep in his car, at the time of the shooting, Harrison answered in the negative. When defense counsel revisited that issue later in his questioning, he again drew a spirited response from Harrison: "If I told [the detective] that [I was sleeping], so where this come from that I said I seen him? If I told the detective that I didn't see him, where did this come from that I said I did see him?"

After recross-examination had concluded, the defendant sought to strike Harrison's testimony because his "one sentence answers to every question" on both direct and cross-examination deprived the defendant of a meaningful opportunity for cross-examination. The motion was denied.

"The issue of whether admission of the statement was proper revolves around *State* v. *Whelan,* [supra, 200 Conn. 743]. In *Whelan,* [our Supreme Court] adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination. . . . A *Whelan* claim is evidentiary in nature and, accordingly, the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial. . . . The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan,* is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused. . . .

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal

prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Eaton*, 59 Conn. App. 252, 264–65, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

We conclude that the court did not abuse its discretion and that the defendant's sixth amendment right of confrontation was not violated. The defendant was not denied all meaningful opportunity for cross-examination. See id., 266–67. Although Harrison was uncooperative with the defense as well as with the state in failing to recall his testimony at Young's suppression hearing, even after he was given an opportunity to review a transcript of it, he confirmed that he was close to the driveway at 711-719 Congress Avenue at the time of the shooting. He also confirmed that his initials appeared on a sworn statement given to the police subsequent to the shooting and on photographs he used at Young's suppression hearing to identify the defendant and Young.

Moreover, defense counsel's persistence on cross-examination yielded lively responses from Harrison on the subject of an alleged sentence modification. Overall, Harrison was clearly reluctant to testify at the defen-

dant's trial, another detail the jury could have used to ascertain his interests and motivations. In addition, Harrison responded to defense counsel's suggestion that he was asleep at the steering wheel of the car at the time of the shooting. In responding to that question, Harrison's reference to his testimony from Young's suppression hearing, read to the jury after direct examination had concluded, was probably more than defense counsel had hoped for.

Harrison was present in court, under oath, and subject to cross-examination. On cross-examination, the defendant had the opportunity to demonstrate Harrison's bias, interest and motive, which were for the jury to assess. Furthermore, the jury had the opportunity to observe and to assess Harrison's demeanor. Given Harrison's claimed loss of memory, defense counsel was not without resources in his cross-examination because the jury might have been persuaded that Harrison's prior testimony was as unreliable as his memory arguably was. The defendant, therefore, was hardly reduced to cross-examining a written statement.

The most effective cross-examination at the time of Harrison's prior testimony could hardly hope to accomplish more than was accomplished by the fact that he told a different, inconsistent story at the defendant's trial. See id., 268. Accordingly, under the circumstances of this case, we conclude that the court did not abuse its discretion by admitting Harrison's prior testimony under *Whelan* and that the defendant's sixth amendment right of confrontation was not violated.

## II

The defendant next claims that he was deprived of a fair trial by several alleged instances of prosecutorial misconduct. Specifically, he argues that he was deprived of a fair trial because the prosecutor (1) improperly buttressed the false testimony of a state's

witness and failed to correct it adequately, and (2) infected the trial with several improper questions and remarks. We disagree.

"[W]e first review the principles that govern our resolution of claims of prosecutorial misconduct. [T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004).

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether the misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 572.

The parties dispute whether the defendant preserved those claims. To the extent that his claims are unpreserved, the defendant seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court has recently ruled, however, that "in cases like the present one, it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination

must involve the application of the factors set out by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense counsel or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 572–73.

A

Knowing Use of False Testimony; Failure to Correct Adequately

The defendant first argues that the prosecutor improperly buttressed the false testimony of the state's witness and failed to correct it clearly and adequately, thereby depriving the defendant of his right to a fair trial. Because we conclude that the defendant could not have suffered any degree of prejudice in these circumstances, we need not decide whether the conduct was improper. See *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990).

The following additional facts are necessary for our resolution of that issue. At the time of his August 12, 1999 testimony at Young's suppression hearing, Harrison had one motion for sentence modification pending. At Young's suppression hearing, defense counsel questioned a cooperative Harrison extensively on that issue.[7] On August 13, 1999, the day after Harrison had testified at Young's suppression hearing, his motion for sentence modification was granted. The prosecutor in Young's trial, the same prosecutor involved in the defendant's trial, appeared at Harrison's hearing on August 13, 1999, and addressed the court on his behalf.[8] The

---

[7] The transcript of Harrison's testimony from Young's suppression hearing, admitted into evidence under *Whelan* in the defendant's trial, indicates that the following colloquy occurred between defense counsel and Harrison during cross-examination:

"[Defense Counsel]: And you have been incarcerated since May of 1997?
"[The Witness]: Yes.

"[Defense Counsel]: That second modification is still pending, is that your understanding? It hasn't been ruled on, is that your understanding?
"[The Witness]: No.

"[Defense Counsel]: It has not been ruled on?
"[The Witness]: I said, three are.

"[Defense Counsel]: So, you filed three sentence modifications?
"[The Witness]: Yes.

"[Defense Counsel]: We talked about the first one, that was sometime in late 1997 or early 1998?
"[The Witness]: Yeah.

"[Defense Counsel]: You filed the second modification when?
"[The Witness]: About five months ago.

"[Defense Counsel]: And you indicated that that was denied?
"[The Witness]: Yes. And then I filed another one recently."

[8] The prosecutor stated: "Just briefly, Your Honor. I feel somewhat obligated to apprise the court of the fact that Mr. Harrison was called to court yesterday in New Haven for a suppression hearing, and I would note this was against his better judgment, at least from his perspective. He did not wish to be there, and he had to be habeased in, but having been brought before Judge Hadden in a suppression hearing, Mr. Harrison has some potential risk to himself.

"He did testify in a matter that is currently pending involving a homicide investigation. And he rendered what I believe to have been truthful and honest testimony in that proceeding, and Mr. Harrison has asked that I be present today in bringing that to the attention of the court, and I am so

court, *Damiani, J.*, granted the motion and suspended the unexecuted portion of Harrison's sentence, effective August 16, 1999. Harrison was placed on probation for a term of eighteen months. By September 10, 1999, Harrison was incarcerated for violation of his probation.

At the defendant's trial, defense counsel cross-examined a more difficult Harrison on the issue of the motion for sentence modification that he had filed before and that was still pending at the time of his August 12, 1999 testimony at Young's suppression hearing.[9] Harrison perjured himself five times on cross-examination. Both he and the prosecutor knew that he had received a sentence modification on August 13, 1999. It also

doing. I would indicate that the information he did testify to under oath was important information, quite frankly, identifying the two parties involved."

[9] The following colloquy occurred between defense counsel and Harrison:

"[Defense Counsel]: Mr. Harrison, we heard the testimony that the clerk read [from Young's suppression hearing] that there was, that you had filed a sentence modification that was pending at the time of that prior hearing, is that right?

"[The Witness]: I don't recall.

"[Defense Counsel]: You don't recall. Okay. *Do you recall whether or not that sentence modification was ever granted?*

"[The Witness]: *No, it wasn't.*

"[Defense Counsel]: *It wasn't. You never got your sentence modified?*

"[The Witness]: *No.*

* * *

"[Defense Counsel]: Well, you had sentence modifications pending back in 1999, didn't you?

"[The Witness]: *They got denied.*

"[Defense Counsel]: Isn't that what you testified? Wasn't the testimony that you just heard [from August 12, 1999], that you had . . . currently one pending, as you were testifying? *You had filed a third one, isn't that true?*

"[The Witness]: *It got denied.*

"[Defense Counsel]: It hadn't been denied back when you were testifying, was it?

"[The Witness]: Nope, *but it got denied.*

"[Defense Counsel]: And you thought that the way to help yourself is tell the state's attorney something they wanted to hear and have them spring you from jail, isn't that true?

"[The Witness]: No, it's not." (Emphasis added.)

appears, however, that defense counsel was aware that Harrison had received a sentence modification before Harrison's cross-examination at the defendant's trial.[10]

On redirect examination, the prosecutor asked Harrison: "[Y]ou really didn't get any benefit out of testifying [at Young's suppression hearing on August 12, 1999], did you, in terms of the modification request, at that time, did you?" After a short recross-examination by defense counsel, consisting of a single question regarding Harrison's ability to see out of his car at the time of the shooting, testimony concluded for the day. Before the jury was brought into the courtroom the following morning, the prosecutor notified the court that he intended to offer, as full exhibits, and by agreement with defense counsel, four motions for sentence modification that had been filed by Harrison.[11] The prosecutor also informed the court that he intended to offer for identification purposes only, again by agreement with defense counsel, a transcript of Harrison's August 13, 1999 sentence modification hearing. The jury was brought into the courtroom, and the prosecutor explained the significance of the sentence modifi-

---

[10] *Prior* to the cross-examination at issue, *on the same day of trial,* July 5, 2001, while objecting to the admission of Harrison's August 12, 1999 testimony under *Whelan,* defense counsel argued that the statement was unreliable: "Now, [Harrison] gives a statement where he has another version of events, and he gives that to the inspector for the state's attorney's office, and that is back in May, 1999.

"And at that point, it becomes clear from the court testimony that he gave [on August 12, 1999], that he had, that he was incarcerated when he gave the statement, that he had filed one sentence modification, had filed another sentence modification immediately after and sent it to the wrong court. *And it's my understanding he was granted a sentence modification after his testimony was given.*" (Emphasis added.)

[11] Harrison's first motion, dated January 4, 1999, was denied on January 8, 1999. The second, dated May 18, 1999, was denied on May 28, 1999. The third, also dated May 18, 1999, was granted on August 13, 1999. The fourth, dated September 10, 1999, less than one month after Harrison's third motion for sentence modification had been granted, was denied on October 27, 1999.

cation applications and orders that were admitted into evidence as full exhibits.[12]

"[T]he knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. . . . Furthermore, due process is similarly offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having [received a sentence modification after testifying for the state in a criminal proceeding], the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, [*Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)] and [*Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)] require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Paradise*, supra, 213 Conn. 399–40.

We conclude that the defendant could not have been prejudiced by the prosecutor's conduct. First, it is unclear whether the prosecutor attempted, as the state

---

[12] The prosecutor informed the jury: "With regard to the exhibits that Your Honor just mentioned, thirty-two, thirty-three, thirty-four and thirty-five, if Your Honor please, the state will indicate, for the record, that these exhibits are entitled sentence modification application motions and the orders relating thereto, and they concern a Carl Harrison.

"The first three are dated on three separate dates *and the motions speak for* [*themselves*] and it's fair to say that those applications were denied. There is a fourth application, *wherein, it indicates the request for modification, it was, in fact, granted.* The state is offering all four of these, and they will be full exhibits for the jury's inspection. There is a fifth document that the state has asked to mark for identification purposes, at this time, which I believe is thirty-six. Thirty-six, at this point, is marked strictly for identification *per agreement of counsel.*" (Emphasis added.)

argues, to "buttress" Harrison's false testimony on redirect examination. The prosecutor's question was unclear, but it certainly can be read to have asked Harrison to confirm that *he had not already received,* at the time of his August 12, 1999 testimony, a sentence modification in return for his promise to testify in that proceeding. Read in that light, the question asked Harrison to admit that at the time of his testimony on August 12, 1999, he had, at most, a mere hope or expectation that his sentence would be modified in return for his cooperation. It is also quite possible that the prosecutor's wording of the question, "you *really didn't get any benefit* out of testifying," referred to the fact that Harrison was back in jail less than one month after he had received his sentence modification. That interpretation of the question is supported by the fact that the prosecutor offered as a full exhibit, the following morning, a fourth application for sentence modification, which revealed that Harrison was incarcerated for violation of his probation on September 10, 1999.

Regardless, it was, or should have been, clear to the prosecutor that Harrison had lied several times on cross-examination, and that his ambiguous question on redirect examination could have added to the jury's misconceptions. The prosecutor, therefore, appropriately offered Harrison's four applications for sentence modification, and the accompanying orders, into evidence as full exhibits on the following morning. He addressed the jury and explained that one motion had, in fact, been granted. Harrison's perjured July 5, 2001 testimony was the last the jury had heard on that afternoon, and the prosecutor's explanation of the significance of the full exhibits admitted into evidence on July 6, 2001, was the first matter addressed to the jury on that following morning.

The defendant argues that the prosecutor's attempt to correct Harrison's false testimony was unclear because

the jury had no way of understanding that Harrison had received his sentence modification the day after testifying at Young's suppression hearing. We disagree. First, it must be noted that defense counsel had stipulated to marking a transcript of the August 13, 2001 sentence modification proceeding for identification purposes only. Second, the court had informed the jury on July 5, 2001, after admitting Harrison's testimony from Young's suppression hearing into evidence under *Whelan*, that Harrison had given that testimony on August 12, 1999.[13] Third, the sentence modification application and order at issue states clearly that it was granted on August 13, 1999. Last, there is strong reason to believe, on the basis of defense counsel's own words, that he was aware of the fact that Harrison's motion had been granted when Harrison testified to the contrary during cross-examination.

Under those circumstances, we conclude that the prosecutor's conduct in correcting his witness' false testimony could not have prejudiced the defendant. Accordingly, we need not decide whether the timing and nature of the prosecutor's efforts to correct the false testimony at issue should be characterized as improper.

B

Questions Compelling the Defendant to Comment on the Veracity of Witnesses; Emphasis in Closing Argument

The defendant also contends that during cross-examination, the prosecutor improperly compelled him to

---

[13] The court informed the jury: "You're all back. Thank you for your patience. In your absence, the court has allowed into evidence as a full exhibit, a certified copy of a portion of the testimony of Mr. Harrison in a judicial proceeding, involving *State* v. *Jermaine Young*, on August 12, 1999."

characterize the testimony of other witnesses[14] and then improperly mischaracterized that testimony during

[14] The following colloquy occurred during the prosecutor's cross-examination of the defendant:

"[The Prosecutor]: And I take it, Mr. Mansfield, then, was incorrect about the fact that it was the gold Delta that was the second car and not the Sable?

"[The Defendant]: Yes.

"[The Prosecutor]: As well as, he was incorrect about the time—

"[The Defendant]: Yes.

"[The Prosecutor]: And who was driving the Mazda?

"[The Defendant]: Yes.

"[The Prosecutor]: And was he also incorrect about whose idea it was to pick the color gold?

"[The Defendant]: I just negotiated a price.

\* \* \*

"[The Prosecutor]: And it was you who subsequently made the payment for the paint job, correct?

"[The Defendant]: I didn't pay for that.

"[The Prosecutor]: And Mr. Mansfield was wrong about that as well, correct?

"[The Defendant]: He didn't say I paid for that car to get worked on.

\* \* \*

"[The Prosecutor]: I'm asking you, isn't it true that Eric Dennis was the gentleman who was with you and [Young] when you went back to pick up [the Mazda]?

"[The Defendant]: No, it was not.

"[The Prosecutor]: Who was that?

"[The Defendant]: It wasn't no one.

"[The Prosecutor]: I'm sorry?

"[The Defendant]: It was nobody.

"[The Prosecutor]: So, it was just you and [Young]?

"[The Defendant]: Yep.

"[The Prosecutor]: So, Mr. Mansfield was wrong about that third person, as well as Eric Dennis, I take it?

"[The Defendant]: Yes.

"[The Prosecutor]: They both were wrong about who was there when they returned?

"[The Defendant]: Yes.

\* \* \*

"[The Prosecutor]: And the reason you asked Eric Dennis to lie about the blue Mazda, sir, as he testified to, was because you knew the word was out on the street that your blue Mazda, with you in it, was involved in the shooting of [the victim], and that you knew that police officers were going to be looking to talk to you and to put you into that car and that shooting, isn't that correct, sir?

"[The Defendant]: No.

"[The Prosecutor]: And that's why you asked Dennis—Eric Dennis to somehow get involved in this and have to lie to police?

closing argument.[15] The state concedes that those questions and remarks were improper.

## C

## Expressions of Opinion Regarding Defendant's Credibility; *Singh*[16] Violation

The defendant next argues that it was improper for the prosecutor repeatedly to label the defendant a liar

"[The Defendant]: His neighbors did that.

"[The Prosecutor]: You heard Mr. Dennis testify in this courtroom under oath, sir, didn't you?

"[The Defendant]: I know what happened.

"[The Prosecutor]: Did you hear him testify under oath, sir?

"[The Defendant]: He was scared of his neighbors.

"[The Prosecutor]: Did you hear—I take it Mr. Mansfield must have been scared of those neighbors too, right?

"[The Defendant]: He had no reason to be.

"[The Prosecutor]: And Tracy Daniels must have been scared of those neighbors too, correct?

"[The Defendant]: Only him.

"[The Prosecutor]: And Itchak Hamo, the owner of the paint shop, he must have been scared of the neighbors too, correct?

"[The Defendant]: (No audible response.)

"[The Prosecutor]: And Gwen Lopez scared of the neighbors also, correct?

"[The Defendant]: Scared of [Young.]

"[The Prosecutor]: And Curtis Hannans scared of [Young] too, correct?

"[The Defendant]: Eric Dennis is scared of both of them.

"[The Prosecutor]: Everybody was scared of those people, is that your testimony?

"[The Defendant]: [Lopez] and Eric Dennis were scared of them.

"[The Prosecutor]: And Eric Canty, he was scared of those people too, I take it?

"[The Defendant]: Eric Canty wanted help.

"[The Prosecutor]: *So, sir, everybody else was wrong but you, correct?*

"[The Defendant]: *I'm not saying everybody is wrong.*" (Emphasis added.)

[15] In his rebuttal argument, the prosecutor remarked: "You heard [the defendant] say on the [witness] stand, under oath, when I asked him, so, you're saying that all these people that offered testimony against you, that contradicts your claims, they're all wrong or they're lying? Yeah. Doesn't that offend your common sense?"

[16] In *State* v. *Singh*, 259 Conn. 693, 709, 793 A.2d 226 (2002), our Supreme Court recognized that "courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied."

during closing argument.[17] We conclude that most of the remarks were proper.

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the

[17] In rebuttal argument, the prosecutor stated: "You know, ladies and gentlemen, [defense counsel] talked about common sense. At an earlier point in time, I asked each of you whether you thought you believed you possessed common sense, and you all indicated you believed you did. And the court is going to tell you, use your common sense when evaluating things.

"Now, doesn't it offend your common sense that the defendant suggests that Eric Dennis' testimony to you why he lied to police is out of fear? When there is *absolutely no evidence to substantiate or support that claim.*
* * *
"And doesn't it offend your common sense, as I indicated, that everyone else in this case is lying or mistaken, when their testimony contradicts this defendant's? Especially, when time and time again, *that evidence indisputably shows that it was the defendant who lied consistently and repeatedly.* Regarding Eric Dennis' involvement with the Mazda, regarding his association with [Young], regarding his motive to get back at Stacey Footman, and most tellingly, regarding his activities on the morning of September 26, 1997.

"And he repeatedly tried to remove himself from that blue Mazda and that area of 711 Congress Avenue, *because he knew that when he drove by that Acura, he had been seen by Carl Harrison, and as a result of that, he had to essentially, be forced to deny he was driving the gold Delta,* lie about the time he went to the daycare center, lie about the time he called [Young], deny obtaining the Mazda with [Young] at Lopez' house, lie about getting the green Sable detailed, lie about when it was [that] he went to the Auto Specialist, lie about the fact that he brought the blue Mazda to the specialist, accompanied by the gold Delta, not the green Sable, and trick his friend, Dennis, into lying to police about who had been using the Mazda.

"*Ask yourselves, ladies and gentlemen, why he made those lies.* Why he tried to remove himself from the time frames involved, and his activities at that point in time." (Emphasis added.)

case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson,* 266 Conn. 440, 462, 832 A.2d 626 (2003).

"It is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) Id., 465–66. "It is not improper for a prosecutor to remark on the motives that a witness may have to lie." Id., 466.

We conclude that all of the comments were proper, except the suggestion that the jury must determine, before finding the defendant not guilty, that the state's witnesses had lied.[18] It was improper for the prosecutor to assert that there was no evidence to substantiate the defendant's assertion that Dennis had lied to the police because he feared people other than the defendant. The prosecutor may argue that the jury can draw certain conclusions from the evidence. Id., 465. It was improper, however, for the prosecutor to state, "in essence, that the only way the jury could conclude that the defendant [was not involved in the shooting] was

---

[18] The prosecutor stated: "And doesn't it offend your common sense, as I indicated, that everyone else in this case is lying or mistaken, *when their testimony contradicts this defendant's?*" (Emphasis added.)

if it determined that [seven] government witnesses had lied."[19] *State* v. *Singh*, 259 Conn. 693, 710, 793 A.2d 226 (2002).[20] The rest of the prosecutor's remarks were proper. The prosecutor did not make a bald assertion that the defendant is a liar, detached from any significant discussion of the evidence. Instead, he argued that the jury could conclude, *after considering the evidence adduced at trial*, that the defendant had lied. Moreover, the prosecutor discussed a motive for the defendant's willingness to lie. Absent the *Singh* violation, we conclude that the prosecutor's remarks were proper.

## D

## Appeal to the Emotions, Passions and Prejudices of the Jury

The defendant last argues that the prosecutor improperly appealed to the emotions, passions and prejudices of the jurors in closing argument when he discussed the significance of the victim's death to the victim's family and how a verdict of guilty would "speak" for the victim.[21] We agree that the comments were improper.

---

[19] See footnote 18.

[20] The analysis in *Singh* applied to the following statement by the prosecutor in that case: "So, everyone else lies. [Christopher Gansen, a witness] lies, [fire investigators Frank] Dellamura [and Joseph] Pettola, [witness Naresh] Komal [and Gary] Dingus [the property manager] they all must be lying because you're supposed to believe this defendant . . . ." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 705–706.

[21] In his rebuttal argument, the prosecutor stated: "I just have one additional thing to point out. I must confess to you that one of my biggest concerns in this matter, in drafting my argument last night, was that while day after day, you've had to face the reality of [the defendant's] presence in this courtroom, the very existence of being here, the same cannot be said for [the victim.] While you've physically seen the defendant sitting at the defense table, the only reminder of [the victim] you have is a family photo and not in an autopsy picture.

"And it was something that one of you folks said during voir dire questioning that struck me at the time and sort of stayed with me. And that was the fact that the *victim isn't here and he can't speak for himself*. Well, that's certainly true. However, I would submit to you that the evidence in this case speaks very clearly on his behalf, and that *you can do so also by your verdicts*." (Emphasis added.)

"A prosecutor . . . may not appeal to the emotions, passions and prejudices of the jurors . . . or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 473. The prosecutor's suggestion that the jury had a duty, as members of the community, to convict the defendant was clearly an improper argument in that it asked jurors to consider matters not in evidence when deliberating the defendant's guilt. See *State* v. *Whipper,* 258 Conn. 229, 271, 780 A.2d 53 (2001), overruled in part on other grounds, *State* v. *Cruz,* 269 Conn. 97, 106, 848 A.2d 445 (2004). It was therefore improper for the prosecutor to inject feelings of sympathy for the victim's family, and an inappropriate comment of the "do your part" variety, into his closing argument. See *State* v. *Ceballos,* 266 Conn. 364, 395, 832 A.2d 14 (2003).

E

Due Process Analysis

We arrive at the question of whether the established improprieties so infected the trial with unfairness as to make the conviction a denial of due process. We conclude that the prosecutor's misconduct did not deprive the defendant of his right to a fair trial.

1

Whether the Misconduct Was Invited

The state claims that the defendant invited the prosecutor's improper questions compelling him to comment on the veracity of the state's witnesses,[22] and improper remarks highlighting that testimony during closing argument,[23] with a theory of defense that all witnesses who

---

[22] See footnote 14.

[23] See footnotes 15 and 18.

identified him as the driver of the blue Mazda at the time of the shooting were either mistaken or lying. Specifically, the state cites defense counsel's closing argument highlighting the theory that Mansfield and Daniels could have been mistaken in their testimony, and that Harrison, Hannans, Lopez and Canty all had reasons to lie. We agree with the state.

The defense in this case was that the defendant had nothing to do with the shooting and that Hannans had driven the blue Mazda at the time of the shooting in an attempt to murder Footman. The defense claimed that all testimony elicited at trial to the contrary, therefore, was either the result of mistake or deceit. The court restated the defense's theory in its instructions to the jury: "The defendant denies that he's the person who was involved in the commission of the alleged offenses. The defendant raises either the issue of mistaken identity or of intentional misidentification."

The following additional facts are necessary for our resolution of that issue. During cross-examination of Daniels, defense counsel tested her memory of whether the defendant had driven the gold Delta to her home on the evening of September 25, 1997. Cross-examination of Hannans explored the details of his encounter with Footman and Hannans' interest in retaliating for the beating and robbery he suffered at the hands of Footman. With respect to Lopez, defense counsel's cross-examination focused on the fact that she had an intimate relationship with Hannans at the time of the shooting and an unsuccessful relationship with the defendant prior to that time. Cross-examination of Harrison focused on whether he had an application for sentence modification pending at the time of his August 12, 1999 testimony at Young's suppression hearing and whether he was actually lying down, asleep in his car, at the time of the shooting. Cross-examination of Dennis explored how often Hannans had used the blue Mazda.

Finally, defense counsel's cross-examination of Canty explored whether he had lied in his statement to the prosecutor in order to get out of jail.

The defendant's testimony at trial contradicted the story described by the state's witnesses. He testified that he drove his mother's green Sable, not the gold Delta, to Daniels' house on September 25, 1997. He testified that he had called Young the following morning in order to arrange a ride home from the Supersonic Car Wash (car wash), because he had planned to drop off his mother's car for detailing. The defendant testified that after he had dropped off Daniels' son, he went directly to the car wash, was picked up by Young in the gold Delta, proceeded to his grandfather's house and spent the rest of the afternoon waiting for the work to conclude on his mother's car. According to the defendant, he did not retrieve the blue Mazda from Hannans at Lopez' house, did not drive it to the driveway of 711-719 Congress Avenue and did not take it to the Auto Specialist to be repainted gold on the morning of the shooting.

Aside from the prosecutor's appeal to jury's emotions, passions and prejudices, we conclude that the defendant invited the prosecutor's misconduct. The defendant's entire theory of defense was predicated on the notion that Harrison, Hannans, Lopez and Canty were lying, and that Mansfield and Daniels were mistaken. It is especially significant that defense counsel reinforced that theory during closing argument, before the prosecutor's improper remarks had occurred. See *State* v. *Stevenson*, supra, 269 Conn. 593.

2

The Frequency and Severity of the Misconduct

The defendant argues that the prosecutor's misconduct was both frequent and severe. We agree that the

misconduct was frequent. On cross-examination alone, the prosecutor improperly asked the defendant to comment on the veracity of the state's witnesses on eight occasions. We also conclude, however, that the misconduct was not severe. "We first note that we consider it highly significant that defense counsel failed to object to any of the [improprieties], request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 479.

We first address the prosecutor's suggestion that the defendant had responded, "[y]eah," to the question: "So, sir, everybody else was wrong but you, correct?"[24] In fact, the defendant had responded: "I'm not saying everybody is wrong." The question before us, however, is not whether the prosecutor should be reprimanded, but whether the remark deprived the defendant of a fair trial. See *State* v. *Thompson*, supra, 266 Conn. 480. The jury heard the defendant testify that it was, in fact, *not* his position that all seven of the state's witnesses were wrong. Moreover, the prosecutor fittingly began his rebuttal argument with the admonition that "[a]nother thing that you should not consider also, quite frankly, is testimony by an attorney as to what somebody is thinking or what they would have said or could have said." That warning echoed a similar message by the prosecutor that was given during his initial argument.[25] The court also instructed the jury that "argu-

[24] Our Supreme Court has ruled that "a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong." *State* v. *Singh*, supra, 259 Conn. 712. Moreover, the court specifically held that there is no distinction "between using the word 'wrong' as opposed to 'lying.'" Id., 712 n.16.

[25] The prosecutor advised the jury: "I want to make clear at the outset that when it comes to deciding what the facts of this case are, you folks are the final determiners of what the evidence showed. So, *if my comments concerning what I believe the evidence was differ from what your memories*

ments and statements" made by the attorneys, particularly in closing argument, should not be considered as evidence.[26]

With respect to the prosecutor's improper questions compelling the defendant to comment on Mansfield's veracity, we note that Mansfield's testimony was corroborated by the work order form that was admitted into evidence as a full exhibit and published to the jury. Dennis' testimony was also corroborated by the work order, because the defendant wrote Dennis' name, in parenthesis, on that form. Of the eight improper questions challenged by the defendant on appeal, six pertained to Mansfield alone, and the seventh pertained to Mansfield and Dennis together. When faced with the eighth improper question, the defendant declined to comment on the veracity of seven state's witnesses. See footnote 14. We also emphasize that the defendant's theory of defense invited the prosecutor's improper questions and remarks. Moreover, the court's general instructions further tempered the misconduct.

### 3

### Centrality of the Misconduct to Critical Issues in the Case and Strength of the State's Case

The critical issue in this case is whether the defendant was driving the blue Mazda at the time of the shooting.

*are, it is your memory that controls* as to what the facts of this case are." (Emphasis added.)

[26] The court instructed: "In reaching your verdict, you should consider all of the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. These include: one, arguments and statements by the lawyers. The lawyers are not witnesses. What they have said during the course of the trial, or in their closing argument, is intended to help you interpret the evidence, but it is not evidence.

"You should weigh and consider the arguments of counsel as to the facts, but if the facts, as you remember them, differ from the way I or the lawyers have stated them, your memory of them controls. If you believe that either attorney stated a personal opinion about the guilt or innocence of the defendant, or about the credibility of any witness or evidence, you must disregard such opinion. These opinions are exclusively yours to make."

All of the key evidence elicited at trial, along with most of the improprieties previously discussed, related directly to that issue. In this case, however, the state's case against the defendant was strong, and the testimony of the state's witnesses was corroborated by the physical evidence, as well as the behavior of the defendant following the shooting. See *State* v. *Thompson*, supra, 266 Conn. 481.

Cellular telephone records indicate that the defendant placed a call to Young at 8:46 a.m. on the morning of the shooting. The day care center's time sheet confirmed that the defendant dropped Daniels' son off at 8:50 a.m. Green testified that he recognized the defendant's blue Mazda as the car involved in the shooting. Harrison testified at Young's suppression hearing that he saw the defendant in the driver's seat of the blue Mazda at the time of the shooting. The testimony of Green and Harrison placed the defendant in the blue Mazda, at the scene of the murder, as the fatal gunshots were fired from that car. That testimony was corroborated by Auto Specialist's business record indicating that the defendant had dropped off a Mazda MX-6 to be repainted on the morning of the shooting, September 26, 1997. The form indicated that the defendant wrote "gold" as the car's color and paid $1160, excluding tax, for the work done. The defendant signed the work order and also wrote the name "Eric Dennis" in parenthesis. The defendant's inclusion of "Eric Dennis" on the work order corroborates Dennis' testimony. Dennis, the defendant's close friend at the time of the shooting, testified that he had lied to the police at the defendant's request concerning his relationship to the blue Mazda. The defendant's behavior on the morning of the shooting, paying a substantial amount of money to get the blue Mazda repainted, and listing Eric Dennis' name on the work order form, was consistent with consciousness of guilt.

All of the testimony, substantial circumstantial evidence and consciousness of guilt evidence was corroborated by the *Whelan* statement of Harrison, who testified, under oath at Young's suppression hearing, that he had seen the defendant in the driver's seat of the blue Mazda and Young in the passenger's seat at the time of the fatal shooting at the driveway of 711-719 Congress Avenue. The evidence, considered as a whole, although not overwhelming, was strong evidence of the defendant's guilt. See *State* v. *Thompson*, supra, 266 Conn. 482. Moreover, "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id., 482–83. In the present case, as in *Thompson*, the physical evidence corroborated the incriminating testimony of the state's witnesses, and the defendant's actions and words subsequent to the shooting offered further corroboration of that evidence. See id., 483.

4

Curative Instructions

The defendant did not object to any of the prosecutor's improper questions or remarks, and the court did not give any specific curative instructions. "We note in this regard, however, that the defendant, by failing to bring [the improprieties] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's [remarks and questions]

when [they occurred] suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons . . . ." (Internal quotation marks omitted.) Id., 483–84.

In addition, the court reminded the jury in its general instructions that the arguments and statements of the attorneys are not evidence, and that the jury alone is responsible for determining the credibility of the witnesses. See footnote 26. The court further instructed the jury: "*You are the sole judges of the facts. It is your duty to find the facts. You are to recollect and weigh the evidence, and form your own conclusions* as to what the ultimate facts are.

"You may not go outside the evidence introduced in court, to find the facts. This means that you may not resort to guesswork, conjecture, or suspicion, and you *must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.*" (Emphasis added.) "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 485. In this case, there is no suggestion that the jury did not follow the court's general instructions.

Accordingly, we conclude that the defendant was not deprived of his right to a fair trial by the prosecutor's misconduct. We also decline the defendant's invitation to invoke our supervisory authority in this case. The prosecutor's misconduct in this case was not "so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) Id., 486.

The judgment is affirmed.

In this opinion the other judges concurred.